# Exhibit 3

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Indian Health Service
Rockville MD  20857

January 23, 2025

Ms. April Kyle
President/Chief Executive Officer
Southcentral Foundation
4501 Diplomacy Drive
Anchorage, AK  99508

Dear President Kyle:

On December 10, 2024, the Indian Health Service (IHS or Agency) received a Final Offer from the Southcentral Foundation (SCF) under 25 U.S.C. § 5387(b), 42 C.F.R. § 137 Subpart H, of the Indian Self-Determination and Education Assistance Act (ISDEAA).  The SCF's Final Offer proposes two amendments that center on services provided in and use of the Alaska  Native Medical Center (ANMC), a state-of-the-art, 182-bed hospital that serves as a pillar of the Alaska Tribal Health System.

Because of the unique role of the ANMC and its importance to Tribal stakeholders, this decision provides an overview of the ISDEAA, the ANMC, Section 325 of Public Law 105-83 (Section 325), the Southcentral Foundation, and the Alaska Native Tribal Health Consortium (ANTHC), in addition to discussing the relevant history of the parties' negotiations throughout 2023 and 2024.  The specific proposals involve: (1) "MCH Services," which seek to add certain specialty services to SCF's funding agreement, including Maternal-Fetal Medicine, Gynecological Oncology, and various pediatric subspecialty services, including "pediatric surgery."  *See* Final Offer § I(B) & Attachment. 2.  And (2) language regarding "Occupancy and Use" of the ANMC hospital.  *Id.* § I(A) & Attachment. 1.  Ultimately, the IHS has multiple reasons for respectfully and fully rejecting the SCF's Final Offer.

Fundamentally, the SCF's Final Offer violates the text, context, and structure of Section 325 because the specialty services at issue are not "primary care" services.  Nor has the ANTHC authorized the services to be transferred to the SCF under Section 325 and the ISDEAA.  The SCF's proposal seeks to assume inherently Federal functions and the SCF seeks to avail itself of funding sources to which it is not entitled.  The Agency also rejects the Final Offer for "Occupancy and Use" because it seeks limitless use of the ANMC hospital contrary to the ISDEAA, despite the fact that control of a Federal facility is an inherently Federal function and, another tenant, the ANTHC, uses the facility for the administration and delivery of healthcare services. 25 U.S.C. § 5387(c)(1)(A)(ii).

Page 2 – Ms. April Kyle

Again, the IHS rejects the SCF's Final Offer regarding both specialty services and "Occupancy and Use" of the ANMC.  25 U.S.C. § 5387(c).  In accordance with the ISDEAA, the IHS continues to offer technical assistance to the SCF to determine whether the parties may develop any modifications to overcome the objections.  25 U.S.C. § 5387(c)(1)(B) and 42 C.F.R. § 137.145.

## Background on the IHS and the ISDEAA

### 1.    Authorizing Statutes

The IHS's fundamental purpose is to provide health care for American Indians and Alaska Natives. *See* S. Rep. No. 102-392, at 2-3 (1992), *as reprinted in* 1992 U.S.C.C.A.N. 3943.  The IHS delivers health care through three mechanisms, by: (1) providing health care services directly (through the Federal Government's facilities); (2) contracting with Tribes and Tribal Organizations pursuant to the ISDEAA to allow Tribes to operate health care programs that the IHS would otherwise provide for American Indians and Alaska Natives; and (3) funding contracts and grants to organizations operating health programs for urban Indians.  *Id.* at 4.

The IHS's authority to provide health care services derives primarily from two statutes.  First, the Snyder Act sets out a general and broad statutory mandate authorizing the IHS to "expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians," for the "relief of distress and conservation of health."  25 U.S.C. § 13; *see also* 68 Stat. 674 (codified at 42 U.S.C. § 2001(a)) (transferring the health-related functions from the Department of the Interior to Health, Education, and Welfare, the predecessor of the Department of Health and Human Services (HHS)).  Second, the Indian Health Care Improvement Act (IHCIA) establishes numerous programs addressing Indian health initiatives. 25 U.S.C. §§ 1601-1683.  The IHS relies on these authorities to develop the health care programs, services, functions, and activities (PSFAs) that it directly operates.

### 2.    The ISDEAA, Cook Inlet Region, Inc. (CIRI), and the Early Alaska Tribal Health Compact

#### A.    The ISDEAA and Final Offer Process

In 1975, Congress passed the ISDEAA, which allows Tribes to contract with the Secretary of HHS, through the IHS, to operate many of the programs that the IHS previously operated for the benefit of Indians.  Under the ISDEAA, self-determination contracting, and self-governance compacting begin when a Tribe or Tribal Organization submits a proposal, which must be approved by Tribal Resolution, to the IHS.  The IHS contracts with Tribes under Title I of the ISDEAA, 25 U.S.C. §§ 5321-32, and compacts with Tribes under Title V of the ISDEAA, *id.* §§ 5381-99.  A Tribe may authorize another Tribe, an inter-Tribal consortium, or a

Page 3 – Ms. April Kyle

Tribal Organization to carry out programs on its behalf, but a Tribal Resolution is required to authorize that action. *Id.* § 5381(b).[1]

Under Title V, the compact sets forth the general "government-to-government relationship" between the parties. 25 U.S.C. § 5384(b). The associated funding agreement: (1) authorizes the Tribe to receive funding for certain PSFAs; (2) identifies the programs to be performed; and (3) with respect to those programs, sets forth the general budget category assigned, the funds to be provided, the time and method of transfer of the funds, and the responsibilities of the IHS. *Id.* §§ 5385(b), (d). In general, the IHS is permitted to contract those PSFAs administered under the authority of various laws as outlined in 25 U.S.C. § 5385(b), including the IHCIA.

After negotiations and upon approval of a contract or compact, the ISDEAA generally provides two primary types of funding: the Secretarial amount and Contract Support Costs (CSC). The "Secretarial amount" or "section 106(a)(1) amount," "shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs . . . without regard to any organizational level within [HHS], . . . including supportive administrative functions." 25 U.S.C. § 5325(a)(1); *see also id.* § 5388(c). Thus, the Secretarial amount explicitly includes funding for all activities, including administrative activities that the IHS also carried out in its operation of the contracted IHS programs.

In 1988, Congress amended the ISDEAA to authorize CSC funding to reimburse additional reasonable costs for activities that contractors must carry out to ensure contract compliance and prudent management, but that were not activities funded as part of the Secretarial amount, either because the Secretary does not normally carry on the activities, or because the Secretary provided for those activities from resources other than those transferred under the contract. *Id.* § 5325(a)(2). The ISDEAA prohibits the IHS from paying CSC funding for activities already funded in the Secretarial amount. *Id.* §§ 5325(a)(2)-(3); *Cook Inlet Tribal Council, Inc. v. Dotomain*, 10 F.4th 892, 894 (D.C. Cir. 2021); *see also Becerra v. San Carlos Apache Tribe,* 602 U.S. 222 (2024) (holding that the IHS must pay eligible CSC incurred by Tribes and Tribal Organizations that expend program income, or third-party reimbursements, under their ISDEAA contracts).

Apart from the Secretarial amount and CSC, Congress added section 105(*l*) to the ISDEAA in 1994 to provide alternative cost principles that allow contractors to recoup facility-related costs associated with carrying out IHS programs. Section 105(*l*) of the ISDEAA requires the Secretary to enter into a lease at the request of a contracting Tribe or Tribal Organization. 25 U.S.C. § 5324(*l*)(1). To receive Section 105(*l*) lease funding, the Tribe or Tribal Organization must have a property interest in the facility, and, critically, the facility must be used for the administration and delivery of services under the ISDEAA. *Id.*

---

[1] A Tribal Organization is defined as "the recognized governing body of any Indian Tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities." 42 C.F.R. § 137.10.

Page 4 – Ms. April Kyle

Section 105(*l*) also requires that each contractor entering into a lease with the IHS to be compensated for the use of the facility leased for administration and delivery of services under the ISDEAA. *Id.* § 5324(*l*)(2). In response to litigation in 2016, the IHS began negotiating and executing section 105(*l*) leases with compensation exceeding funds already provided under the existing ISDEAA agreement. In general, compensation may include rent, depreciation based on the useful life of the facility, principal and interest paid or accrued, operation and maintenance expenses, and other reasonable expenses identified by regulation. *Id.*[2]

If the IHS and a Tribe or Tribal Organization cannot agree on the terms within the scope of a Title V agreement through the negotiation process, the Tribal Organization can submit a "final offer" to the IHS. 25 U.S.C. § 5387(b). If the IHS rejects a final offer, in whole or part, the Agency must provide a written notification that "contains a specific finding that clearly demonstrates, or that is supported by a controlling legal authority," that one or more of the rejection bases apply:

> (i) the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled . . . ;
>
> (ii) the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe;
>
> (iii) the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or
>
> (iv) the Indian tribe is not eligible to participate in self-governance under section 5383 of this title.

25 U.S.C. § 5387(c).

## B.    Cook Inlet Region, Inc. (CIRI) and the Alaska Tribal Health Compact

The current dispute involves a Title V Tribal Organization and inter-Tribal consortium, the Southcentral Foundation, which acts on behalf of Cook Inlet Region, Inc. (CIRI), in addition to other Tribes, which include the following: the Aleut Community of St. Paul Island; Igiugig Tribal Village Council; Iliamna Village Council; Kokhanok Native Village Council; McGrath Native Village Council; Newhalen Tribal Council; Nikolai Edzeno' Village Council; Nondalton Tribal Council; Pedro Bay Village Council; Takonta Tribal Council, and the Telida Native Village Council.

---

[2] 25 C.F.R. Part 900, Subpart H regulations establish additional requirements for section 105(*l*) leases. Contractors may propose leases based on fair market rental, a list of elements of compensation identified at 25 C.F.R. § 900.70, or a combination of fair market rental and a portion of the list of elements of compensation. *Id.* § 900.74. Contractors may not receive compensation for the same item twice. *Id.* Alternatively, contractors may recover the same types of costs, in whole or in part, through Secretarial amount funds and CSC under section 106(a) of the ISDEAA as direct or indirect charges. *Id.* § 900.7.

Page 5 – Ms. April Kyle

CIRI is an Alaska regional profit corporation established pursuant to the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601, *et seq.*, for the geographic area that includes the Municipality of Anchorage. *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471, 1473 (9th Cir. 1987) (since 1976, CIRI has been recognized as an Indian tribe by the Bureau of Indian Affairs (BIA) and IHS for purposes of the Self-Determination Act); *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 343 & 350 (2021) (Alaska Native Corporations (ANC) come in two varietals – regional ANCs and village ANCs, and concluding that ANCs "satisfy ISD[EA]A's Indian tribe definition").

For several years, the CIRI directed the agencies to contract with Cook Inlet Native Association (CINA) to provide some programs; however, in 1983, the CIRI informed the CINA that it would no longer serve as its designated Tribal Organization. *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d at 1473. Rather, the CIRI formed two other non-profit corporations, the Cook Inlet Tribal Council, Inc. (CITC) and the Southcentral Foundation (SCF), both of which maintain current ISDEAA agreements with the IHS. *Id.*; *see also Cook Inlet Tribal Council, Inc. v. Dotomain*, 10 F.4th 892, 893 (D.C. Cir. 2021) (the CITC runs an alcohol recovery program under a self-determination contract and represents eight federally recognized Tribes in Alaska).

In the Act of October 5, 1988, Pub. L. 100-472, 102 Stat. 2285, 2296-98 (1988), Congress added Title III of the ISDEAA, which provided for the Tribal Self-Governance Demonstration Project by which Tribes "compact" with the United States (U.S.) Department of the Interior (DOI) and HHS using a streamlined "compact" and "annual funding agreement." Originally, Congress limited Title III to the DOI, but amended Title III to include HHS in 1992.

On October 1, 1994, the HHS Secretary, through the IHS Director, entered into a compact with certain Alaska Native Tribes pursuant to Title III of the ISDEAA, including the CIRI and its Tribal Organization, the SCF. *See Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 988 (9th Cir. 1999). The compact is known as the Alaska Tribal Health Compact, which has since been amended and restated numerous times under Title III. *See* Ex. 1.[3] The Compact was then further amended and restated, including in Fiscal Year 2001, effective October 1, 2000, to conform with Title V of the ISDEAA.[4] *Id.*

The Alaska Tribal Health Compact comprises 25 Tribal Co-signers, including the SCF, in addition to the ANTHC, each with distinct funding agreements reflective of a singular history. "Alaska is often the exception, not the rule." *See Confederated Tribes of Chehalis Rsrv.*, 594 U.S. at 342.

---

[3] Relevant dates include October 1, 1995, October 1, 1996, October 1, 1997, October 1, 1998, October 1, 2000. Ex. 1.

[4] Relevant dates include October 1, 2003, October 1, 2006, October 1, 2008, October 1, 2010, and October 1, 2023. Ex. 1(a)-(b).

Page 6 – Ms. April Kyle

The diagram that follows represents the relationship between the Alaska Tribal Health Compact and its cosigning entities and the ANMC:



3.      **Section 325 of Public Law 105-83, the Alaska Area Native Health Service (IHS) and the Alaska Native Medical Center**

        A.      **Overview of Section 325**

A singular part of Tribal health care in Alaska is Section 325 of the Department of the Interior and Related Agencies Appropriation Act, Public Law 105-83, 111 Stat. 1543, 1597 (1997), which Congress enacted to address the governance of the then-new ANMC that the IHS constructed in the mid-1990s. *See Southcentral Foundation v. Alaska Native Tribal Health Consortium*, 983 F.3d 411, 414 (9th Cir. 2020); S. Rep. 105-56, 109-111 (July 22, 1997).

By enacting Section 325, Congress was aware that "in [the] over 2 years of negotiations among Alaska Native entities, the existence of over 200 recognized tribes, regional entities, and various other concerned organizations," that reaching consensus around a particular governing structure was "exceptionally difficult to achieve." S. Rep. 105-56, 110 (July 22, 1997); *Southcentral Foundation v. Alaska Native Tribal Health Consortium*, 983 F.3d at 414.

To break the deadlock, Congress sought to keep the statewide services of the ANMC and the IHS Alaska Area office intact in Anchorage and managed by the new consortium, with the exception of primary care services. S. Rep. 105-56, 110 (July 22, 1997); *Southcentral Foundation v. Alaska Native Tribal Health Consortium*, 983 F.3d at 414. Further, legislative history indicates that Cook Inlet Region, Inc., through SCF or any lawfully designated health care entity of CIRI, may enter into a funding agreement with the IHS to provide all primary health care services now being provided by the Alaska Native Primary Care Center (ANPCC)

Page 7 – Ms. April Kyle

and the Alaska Native Medical Center, including through satellite clinics, in order to encourage the efficient management of primary care services provided by both the ANPCC and the ANMC. *Id.*

In general, primary care may be defined as:

> [T]he provision of integrated, accessible health care services by physicians and their health care teams who are accountable for addressing a large majority of personal health care needs, developing a sustained partnership with patients, and practicing in the context of family and community. The care is person-centered, team-based, community-aligned, and designed to achieve better health, better care, and lower costs.

> Primary care physicians specifically are trained for and skilled in comprehensive, first contact, and continuing care for persons with any undiagnosed sign, symptom, or health concern (the "undifferentiated" patient) not limited by problem origin (biological, behavioral, or social), organ system, or diagnosis. Additionally, primary care includes health promotion, disease prevention, health maintenance, counseling, patient education, diagnosis and treatment of acute and chronic illnesses in a variety of health care settings (e.g., office, inpatient, critical care, long-term care, home care, schools, telehealth, etc.). Primary care is performed and managed by a personal physician who often collaborates with other health professionals, and utilizes consultation or referral as appropriate. Primary care provides patient advocacy in the health care system to accomplish cost-effective and equitable care by coordination of health care services. Primary care promotes effective communication with patients and families to encourage them to be a partner in health care.

*See* American Academy of Family Physicians, Policies, Primary Care, *available online at* Primary Care | AAFP (last visited January 15, 2025); *see also* Healthcare.gov, Glossary, Primary Care, *available online at* Primary care - Glossary | HealthCare.gov (last visited on January 15, 2025); (providing: health services that cover a range of prevention, wellness, and treatment for common illnesses.  Primary care providers include doctors, nurses, nurse practitioners, and physician assistants.  They often maintain long-term relationships with you and advise and treat you on a range of health-related issues.  They may also coordinate your care with specialists).

A primary care physician can be defined as:

> [A] specialist in family medicine, general internal medicine or general pediatrics who provides definitive care to the undifferentiated patient at the point of first contact, and takes continuing responsibility for providing the patient's comprehensive care. This care may include chronic, preventive and acute care in both inpatient and outpatient settings. Such physicians are specifically trained to provide comprehensive primary care services through residency or fellowship training in acute and chronic care settings.

> Primary care physicians devote most of their practice to providing primary care services to a defined patient population. The primary care practice style is such that the personal primary care physician serves as the entry point for the patient's health care needs - not limited by problem origin, organ system, or diagnosis.

Page 8 – Ms. April Kyle

> Primary care physicians advocate for the patient in coordinating the use of the
> entire health care system to benefit the patient.

American Academy of Family Physicians, Policies, Primary Care, *available online at* <u>Primary Care | AAFP</u> (last visited January 15, 2025).  A general practitioner in Obstetrics/Gynecology, may often serve as primary care provider for women of childbearing age.

Through Section 325, Congress sought to address the issue of "governance of the [then] new Alaska Native Medical Center to ensure efficient, experienced Alaska Native management and control when responsibility for its operation is transferred from the Indian Health Service to Alaska Native management."  S. Rep. 105-56, 110 (July 22, 1997).  Indeed, the ANMC in Anchorage, Alaska, has served and continues to serve as the statewide referral center at the heart of the historical hub-and-spokes model of the Alaska Tribal Health System:



**The Alaska Native Health Care System Referral Pattern**
**Same Scale Comparison - Alaska Area to Lower 48 States**

Section 325 authorized "regional health entities" to form a "consortium" without further resolutions from their authorizing Tribes, and for the "consortium" to then enter a contract or compact and funding agreements under the ISDEAA to provide all statewide health services provided by the IHS through the Alaska Native Medical Center and the Alaska Area Office:

> (a) Notwithstanding any other provision of law, and except as provided in this section, *the Aleutian/Pribilof Islands Association, Inc., Bristol Bay Area Health Corporation, Chugachmiut, Copper River Native Association, Kodiak Area Native Area Association, Maniilaq Association, Metlakatla Indian Community, Arctic Slope Native Association, Ltd., Norton Sound Health Corporation, Southcentral Foundation, Southeast Alaska Regional Health Consortium, Tanana Chiefs Conference, Inc., and Yukon–Kuskokwim Health Corporation (hereinafter "regional health entities"), without further resolutions* from the Regional Corporations, Village Corporations, Indian Reorganization Act Councils, tribes and/or villages which they represent *are authorized to form a consortium* (hereinafter "the Consortium") *to enter into contracts, compacts, or funding agreements* under Public Law 93–638 (25 U.S.C. 450 et seq.), as

Page 9 – Ms. April Kyle

> amended, *to provide all statewide health services provided by the Indian Health Service of the Department of Health and Human Services through the Alaska Native Medical Center and the Alaska Area Office*. Each specified "regional health entity" shall maintain that status for purposes of participating in the Consortium only so long as it operates a regional health program for the Indian Health Service under Public Law 93–638 (25 U.S.C. 450 et seq.), as amended.

Pub. L. No. 105–83, § 325(a), 111 Stat 1543, 1597 (1997) (emphasis added). Notably, Section 325(a) references "*all* statewide health services . . . through the Alaska Native Medical Center and the Alaska Area Office."

Under Section 325(b), the Consortium is governed by a 15-person board of directors composed of one representative from each of the 13 regional health entities (including Southcentral Foundation) plus two additional representatives of Indian Tribes and sub-regional tribal organizations, which operate health programs that are "not affiliated with the regional health entities. . . ." 111 Stat. 1543, § 325(b).

Section 325(c) goes on to broadly define "statewide health services," with two limits, including those services identified under Section 325(d):

> (c) The *statewide health services* (including *any* programs, functions, services and activities provided as part of such services) of *the Alaska Native Medical Center and the Alaska Area Office may only* be provided by the Consortium. *Statewide health services for purposes of this section shall consist of all programs, functions, services, and activities provided by or through the Alaska Native Medical Center and the Alaska Area Office, not under contract or other funding agreement with any other tribe or tribal organization as of October 1, 1997, except as provided in subsection (d) below.* All statewide health services provided by the Consortium under this section shall be provided pursuant to contracts or funding agreements entered into by the Consortium under Public Law 93–638 (25 U.S.C. 450 et seq.), as amended, and for such purpose the Consortium shall be deemed to have mature contract status as defined in section 4(h) of the Indian Self–Determination and Education Assistance Act (25 U.S.C. 450b(h)).

111 Stat. 1543, § 325(c) (emphasis added). *See Southcentral Found. v. Alaska Native Tribal Health Consortium*, 983 F.3d 411, 413 (9th Cir. 2020) (noting the ANTHC is an intertribal consortium created by Congress to provide "certain" statewide health services).

Finally, Section 325(d) provides terms relative to the CIRI and "primary care" services that are discussed in greater detail below in the decision section:

> (d) Cook Inlet Region, Inc., through Southcentral Foundation (or any successor health care entity designated by Cook Inlet Region, Inc.) pursuant to Public Law 93–638 (25 U.S.C. 450 et seq.), as amended, is hereby authorized to enter into contracts or funding agreements under such Public Law for all services provided at or through the Alaska Native Primary Care Center or other satellite clinics in Anchorage or the Matanuska–Susitna Valley without submission of any further authorizing resolutions from any other Alaska Native Region, village corporation, Indian Reorganization Act council, or tribe, no matter where located. Services provided under this paragraph shall, at a minimum, maintain the level of statewide

Page 10 – Ms. April Kyle

> and Anchorage Service Unit services provided at the Alaska Native Primary Care Center as of October 1, 1997, including necessary related services performed at the Alaska Native Medical Center. In addition, Cook Inlet Region, Inc., through Southcentral Foundation, or any lawfully designated health care entity of Cook Inlet Region, Inc., shall contract or enter into a funding agreement under Public Law 93–638 (25 U.S.C. 450 et seq.), as amended, for all primary care services provided by the Alaska Native Medical Center, including, but not limited to, family medicine, primary care internal medicine, pediatrics, obstetrics and gynecology, physical therapy, psychiatry, emergency services, public health nursing, health education, optometry, dentistry, audiology, social services, pharmacy, radiology, laboratory and biomedical, and the administrative support for these programs, functions, services and activities. Cook Inlet Region, Inc., through Southcentral Foundation, or any lawfully designated health care entity of Cook Inlet Region, Inc., may provide additional health care services at the Alaska Native Medical Center if such use and services are provided pursuant to an agreement with the Consortium. All services covered by this subsection shall be provided on a nondiscriminatory basis without regard to residency within the Municipality of Anchorage.

111 Stat. 1543, § 325(d).  Finally, and relevant for present purposes, the physical facility of ANMC hospital remains the property of the United States.

**Background of Funding Agreement Negotiations for
Maternal Child Health (MCH) Specialty Services and "Occupancy and Use" of the ANMC**

**1.     Funding Agreement Negotiations Regarding MCH Specialty Services**

The SCF and the Agency executed a  Fiscal Year (FY)  2023 Funding Agreement, effective October 1, 2022, and remaining in effect until renegotiated, pursuant to 25 U.S.C. § 5385(e). Exs. 2 & 2.1.  In April , 2023, as part of the annual negotiation process for the following fiscal year, FY 2024, the SCF proposed entry of a new funding agreement.  Exs. 3.1 – 3.5.

After reviewing the SCF's proposed changes to Section 3(a)(L), Obstetrics & Gynecology (OB/GYN), the Agency followed-up about how Maternal Fetal Medicine (MFM) and Gynecological Oncology (Gyn/Onc) were "currently carried out and whether it is done as part of specialty care services at ANMC via ANTHC."  Ex. 4.[5]  The SCF sought to add these to Section 3(a)(L) of its funding agreement.  The Agency initially noted that "if carried out by ANTHC, whether ANTHC may have agreed to SCF performing these additional services in accordance with Section 325(d). Or perhaps the additions are focused on ANPCC as opposed to ANMC." *Id.*

---

[5]  In more lay terms, Maternal Fetal Medicine (perinatology) physicians are experts in high-risk pregnancies, and they provide care when a medical condition, congenital disorder, or disease may cause pregnancy or delivery complications.  *See*, Perinatologist, available online at What Is A Perinatologist? What To Expect & When to See One (last visited on January 15, 2025).  On the other hand, a Gynecological Oncologist is a surgeon who specializes in the diagnosis and surgical management of cancerous and noncancerous conditions of the female reproductive system, including cervical cancer, endometriosis, fibroids, ovarian cancer, pelvic masses, uterine cancer, vaginal cancer, and vulvar cancer.  *See e.g.*, Gynecological Oncology, Overview, available online at Gynecologic oncology - Overview - Mayo Clinic (last visited January 15, 2025).

Page 11 – Ms. April Kyle

The SCF shared its initial response and attached a Memorandum of Agreement (MOA) that the ANTHC and the SCF had entered—unbeknownst to the IHS—with an effective date of January 1, 2023.  Ex. 5. The MOA has numerous provisions, but the SCF summarized its May 2023 perspective with a particular focus (at the time) on Maternal Fetal Medicine and Gynecological Oncology services:

> *At 10/1/1997, MFM and Gyn-Onc services did not exist as separate specialties at ANMC/ANPCC. To the extent those services were provided, they were mostly paid for outside of ANMC/ANPCC under Contract Health Services (now PRC). As services at ANMC/ANPCC have expanded over time, previous ANTHC administrations insisted that because these were not specific separately identifiable specialty services provided by ANPCC/ANMC as of 10/1/1997, they were an ANTHC obligation. While SCF never agreed with ANTHC on this point, it did not object as long as ANTHC was willing to provide the services in accordance with the Assurances, including the sections referenced in your e-mail below. SCF has made space available for these services provided by ANTHC staff in its facilities – first in the ANPCC and in more recent years in the Gottlieb Building. However, with the more recent changes in ANTHC senior management, ANTHC changed its position and requested that SCF take on this responsibility, which it now believes under Section 325 are more properly provided by SCF. SCF and ANTHC negotiated an MOA describing the transfer, a copy of which is attached to this e-mail. Although we did not think about it at the time we submitted our proposed changes to SCF's FY 2024 FA, we probably should add this MOA to the list of agreements described in Section 21 of SCF's FA.*

In SCF's view: (1) the separate specialty services did not exist at the time of transfer in the 1990s; (2) the ANTHC (under prior administrations) had taken the position that the services were the ANTHC's obligations; (3) the SCF did not object as long as the ANTHC was willing to provide the services and actually made space for the ANTHC's services in the SCF's facilities; and (4) the ANTHC and the SCF (without any involvement by the IHS) "negotiated an MOA describing the transfer" (from ANTHC) to the SCF.  Ex. 5.  According to the SCF, "[e]ffective 1-1-2023, Maternal Fetal Medicine (MFM) and Gynecological/Oncology (Gyn-Onc) are services provided by SCF." *Id.*

### A.    Maternal-Fetal Medicine and Gynecological Oncology Are Not the Only Focus of the MOA, Which Included Numerous Additional Services

As noted, the initial funding agreement proposal from the SCF sought to add new terms to Section 3(a)(L), Obstetrics & Gynecology (OB/GYN), specifically including a paragraph referencing Maternal-Fetal Medicine, also referred to as perinatology, plus another paragraph referencing Gyn/Oncology. Ex. 3.1.2 at 7-8.  However, the MOA between the ANTHC and the SCF expressly recited that the ANTHC provides the MCH services at the ANMC, including Inpatient Pediatric Services and Pediatric subspecialty services:

> ANTHC provides Maternal Child Health services at the Alaska Native Medical Center ("ANMC"), which includes Maternal Fetal Medicine, Inpatient Women's Health services, OB GYN Oncology services, Inpatient Pediatric Services, and Pediatric subspecialty services (the "MCH services").

Page 12 – Ms. April Kyle

Ex. 5.1 at 1. Yet, the SCF initially sought no changes to the pediatrics section of its funding agreement.[6]

The MOA also provided for "compensation" related to Speech and Language Pathologists positions and stated: "SCF will provide inpatient pediatric speech and language services by employing the Speech and Language Pathologist individual listed in [Appendix] B or her replacement and an additional individual(s) or contractor(s) as necessary to maintain services at the same or higher level of service as provided during fiscal year 2022." *Id.* at § 6a.

Simply put, the MOA involved multiple distinguishable services including: (1) Maternal-Fetal Medicine; (2) Gynecological Oncology; (3) various pediatric subspecialty services; but also (4) Speech and Language Pathology.  In trying to understand the arrangement between the SCF and the ANTHC, the Agency often referred initially to just the MCH, but the distinctions between services grew over time as a better understanding developed.  The MOA also appeared to involve several moving parts regarding certain providers: first, direct ANTHC employees would transfer to SCF employment; secondly, U.S. Commissioned Corps employees would be reassigned from the ANTHC to the SCF (by request through the IHS); and finally, the SCF would assume extensive contracts involving third-party contractors (health care organizations).[7]

In total, the MOA addressed (20) ANTHC personnel: (8) physicians directly employed by ANTHC; (3) OB/GYN Oncologists; (2) Maternal-Fetal Medicine specialists; (3) pediatric specialists); (8) additional direct employee positions (including one apparently vacant Speech and Language Pathologist position, at the time); and (4) U.S. Commissioned Corps personnel. Additionally, the MOA identified (30) additional specialty physicians managed through (10) separate health care organizational contracts maintained by the ANTHC, including for example Pediatric Plastic Surgery – Cleft Lip & Palate. Ex. 5.1 at Appendices A, B, C.

Given the MOA, as well as SCF's initial April 2024 proposal, the IHS continued to seek a better understanding of the apparent arrangement during in-person annual negotiations in May 2023.[8]

---

[6] Among other MOA terms, ANTHC and SCF referenced "Statewide MCH Services" and stated that any MCH Services provided by SCF at ANMC after the Transfer Date will be available to all Alaska Native and American Indian residents of Alaska, including "wherever he or she may reside in the State of Alaska." Ex. 5.1 at § 8.  The MOA stated that after the Transfer Date (January 1, 2023), the SCF "will, at a minimum, maintain the same level of MCH Services that ANTHC has provided during the year prior to the Transfer Date." *Id.* at § 7a.  The MOA is subtitled, "Transfer Maternal Child Health Service *Providers* to SCF." *Id.* (emphasis added).

[7] The ANTHC and the SCF also identified certain potential contingencies such as an employee rejecting the transfer whereby and for "illustration purposes only," ANTHC would continue to employ the individual employee and bill SCF for the applicable position fully burdened costs, as well as ANTHC seeking to terminate its contractual arrangements "as soon as reasonably practicable on or after January 1, 2023." Ex. 5.1 at § 3e & 5.

[8] In general, annual negotiations (also commonly referred to as "final negotiations") take place in-person during May of each year.  The term meant to distinguish that period from the "pre-negotiations" session that typically occurs during the third week of March.  At annual (final) negotiations, the Alaska Tribal Health Compact and the Agency regularly address the list of open items presented by the Co-signers of the Compact, negotiate common items, and negotiate individualized funding agreements for each Co-signer.

Page 13 – Ms. April Kyle

### B. The May 2023 Annual Negotiations Ended with Ongoing Technical Assistance

The ANTHC, the SCF, and the IHS held extensive discussions on the services and the MOA during the closing days of annual negotiations for FY 2024 with Alaska Tribal Health Compact Co-signers from May 15-19, 2023.  This included both written and verbal exchanges to address questions such as:

> (1) Who is responsible for the assurance for impacted PSFAs?
> (2) How will the assurances be sustained for impacted PSFAs?
> (3) Is ANTHC purchasing services from SCF? Or is this a transfer of PSFAs under Section 325(d)?
> (4) Does ANTHC provide any Women's Health Services with ANTHC providers (excluding those MCH services it is now "buying back" from SCF under the MOA?)
> (5) Does ANTHC provide any inpatient pediatric services with ANTHC providers?
> (6) Does ANTHC provide any pediatric subspecialty services with ANTHC providers?

Exs. 6-7.  The big picture takeaways included:

- The SCF proposed revised FY 2024 funding agreement language on May 17, 2023, which now sought changes to funding agreement Section 3(a)(K) – Pediatrics, as well as changed the SCF's original language proposal regarding Section 3(a)(L) – Obstetrics & Gynecology (OB/GYN).  The SCF also added a proposed term to Section 21 (to reference the MOA), Exs. 8-9 (with attachments).

- A couple of days later, the SCF shifted its proposal on Sections 3(a)(K) and (L) to FY 2023, rather than FY 2024, reflecting a January 1, 2023, proposed effective date.  Ex 10 (with attachment).  Upon review, this version appears to align with the current Final Offer submitted by the SCF; but there is no reference to the Section 21 proposal in either the May 2023 version or the Final Offer.

- To the extent it could be determined at the time, the ANTHC continued to provide MCH services directly, including pediatric surgery and pediatric critical care utilizing pediatric intensivists (critical care physicians in the Pediatric Intensive Care Unit (PICU)). Exs. 11-12.

- Initial exemplar relevant language from the ANTHC's funding agreement included:

> Section 3.1.7.1.10 **Women's Health Service** in collaboration with SCF provides obstetrical and gynecological services, *including perinatology services*; antenatal testing, and newborn nursing services.

> Section 3.1.7.1.7 **Pediatric Services** provides, in collaboration with SCF, primary care for neonates, infants, children and adolescents; *pediatric specialty care*; *consultation with pediatric sub-specialists and health care providers*, schools, and other individuals, programs, and

Page 14 – Ms. April Kyle

> agencies providing supportive services; neonatal ~~care, and~~ newborn care, <u>including nutritional therapy and provision of donated breast milk</u>~~and~~; *support for high- risk deliveries; and pediatric intensive care. The "PSFAs"* Ex. 13 (with attachment) (emphasis added in italics).

- And ANTHC offered the following summary:

> Section 325 is not a model of clarity – as we read the statute, *some aspects of women's health are SCF's responsibility and some are ANTHC's as an initial matter*. As we said, *the slice of services we're discussing are highly specialized and are not addressed by the assurances. The "PSFAs" at ANMC have been redesigned and related funding has been reprogrammed multiple times over the years.* In some cases, this has been formalized in purchase agreements, amendments to the revenue share, and FA changes. *ANTHC and SCF are still in the process of sorting out the details of the adjustment that we've been discussing. As described, we are compensating SCF for its increased role.* That said, *ANTHC will continue to be involved in providing women's health services in collaboration with SCF.* We do not think it is necessary or appropriate to include that level of detail in our funding agreement. *In light of SCF's prior and ongoing involvement in providing MCH services, we do not object to SCF adding those provisions to their funding agreement.* If IHS believes further discussion with the IHS is needed, we would like to request technical assistance to better understand the framework and terminology IHS is using which seems to be confusing the discussion.  Ex. 14 (emphasis added).

The parties did not close the issues and pursued technical assistance after the FY 2024 annual negotiations.

From the Agency's perspective, the fundamental questions in May 2023 were whether the ANTHC had sought to transfer PSFAs that it had been providing—to the SCF—under Section 325(d), or if the ANTHC was still performing the PSFAs and utilizing the SCF as a type of subcontractor, and whether these activities involved recurring Agency funding for related activities.[9]

---

[9] An additional facet here is the Assurances Regarding Services from the Alaska Native Medical Center and Alaska Native Primary Care Center, which are appended to the SCF's and the ANTHC's respective funding agreements, but which the IHS remains responsible for negotiating (on behalf of Alaska Natives and American Indians) to the effect that Co-signers continue to receive non-residual services from the ANMC and the Alaska Area IHS provided by the ANTHC and the SCF at a minimum level that such PSFAs were provided by the IHS as of October 1, 1997, to the extent permitted by Section 325 of P.L. 105-83. Ex. 2 § 1.  An initial aspect of the Agency's focus was whether historical services were involved and accordingly if the minimum level of service aspect of Section 325 had been called into question by the activities undertaken by the SCF and the ANTHC without the IHS's awareness.

Page 15 – Ms. April Kyle

### C.     The SCF's and the ANTHC's Respective Positions Changed Throughout 2023

After the annual negotiations in May 2023, the ANTHC and the SCF began technical assistance with the IHS.  In addition to written exchanges and sharing of documents, including the 1999 ANMC budget, the IHS met separately with the ANTHC on June 6, 2023, the SCF on June 8, 2023, and then had planned to meet with both parties on June 15, 2023.  Ex. 15. However, the ANTHC and the SCF met on their own on June 13, 2023, and submitted responses and recommendations to the IHS that seemed to highlight that the ANTHC and the SCF fundamentally disagreed about the authority to perform the PSFAs at issue under Section 325.

Nevertheless, the ANTHC and the SCF both sought to categorize the payments between the two entities under the MOA as "sub-contractual," and neither the ANTHC or the SCF sought additional meetings with the IHS:

> SCF's position is that given how and where OB-Gyn (Women's Health) services were provided when Section 325 was enacted these services fall under SCF's PCC program authority under 325(d).  ANTHC's position is that because the MOA concerns specialty services provided on a statewide basis, they fall under ANTHC's ANMC program authority under 325(c).
>
> The parties agree, however, that IHS need not resolve this question because either way 325(d) authorizes SCF to perform these services.
>
> . . .
>
> *ANTHC and SCF have agreed that the payments by ANTHC to SCF under the MCH MOA can be categorized as a subcontract and no further meetings with IHS are needed on this issue.*

Ex. 16.  As part of its response, the ANTHC also provided a staffing spreadsheet indicating that the ANTHC still continued to employ a MFM (perinatologist) physician in addition to six additional physicians related to pediatrics PICU and Neonatal Intensive Care Unit services. Ex. 16.1.

Significantly, the SCF concurred with the ANTHC's statements that the payments (from the ANTHC to the SCF under the MOA) can be categorized as a subcontract.  Ex. 17.  The IHS responded on July 5, 2023, by thanking the parties for the joint feedback and recommendation, and requested that the SCF withdraw the FY 2023 proposed amendment because there is no authority for the IHS to enter into a prime contract with a subcontractor:

> . . . The IHS/Alaska Area remains available for further technical assistance but believes that it is critical to note that if the MOA creates a subcontracting relationship between ANTHC and SCF – this will impact SCF's FY 2023 proposal.  IHS cannot include ANTHC's PSFAs (that ANTHC is subcontracting through SCF) in SCF's FA as though those PSFAs are SCF's. Is SCF willing to withdraw its proposal?

Ex. 18.

Page 16 – Ms. April Kyle

On July 26, 2023, the SCF declined to withdraw its proposal; however, the SCF then stated that while it was able to concur with the categorization that the *payments* received by the SCF from the ANTHC under the MOA were as a subcontract, those payments only represent a small fraction of the costs of the PSFAs being assumed by the SCF: "Simply put, ANTHC has no programmatic control or legal responsibility for the ANMC MCH services moved ("transferred") from ANTHC to SCF under the MOA . . . ." Ex. 19.

The ANTHC responded by arguing among other things that: "ANTHC and SCF both understand the MCH MOA to be a subcontract.  SCF characterizes it as a subcontract only regarding the payment.  However, legally, that would be a gift and not a contract."  Ex. 20.  And the ANTHC continued: "Nowhere does ANTHC agree that it will cease to the [sic] provide the services, which it would have to if the MOA was intended to effect a full transfer of PSFAs." *Id.*

In addition, the parties' arguments appeared to distinguish between the transfer of providers, as opposed to the transfer of services.  *Id.*  The ANTHC requested further technical assistance from the IHS to discuss, including on the point that "SCF insinuates that the MCH MOA is a permanent transfer of PSFAs."  *Id.*  The IHS and the ANTHC scheduled another technical assistance session for September 8, 2023; the SCF took the position that further technical assistance should not necessitate any further delay regarding its FY 2023 proposed amendment.

In advance of the September 8, 2023, meeting with the ANTHC, the Agency shared the following attempt to identify the issues for ongoing discussion:

> Based on the most recent correspondence in August, the extent of the overlap between the two entities appears as follows: (a) the parties indicate agreement that the arrangement is sub-contractual, yet SCF maintains that this relates to (a portion of) the payment arrangement (only), whereas ANTHC maintains the (entire) arrangement is sub-contractual.  Nevertheless, (b) both parties [apparently] believe IHS should agree to have the subcontracted ANTHC PSFAs in both agreements under the same Compact. Yet, ANTHC highlights its ongoing disagreement with SCF's insinuation that there has been a permanent transfer of PSFAs, or that there has been a permanent transfer of a portion of any PSFAs; ANTHC has requested individualized IHS technical assistance to address this ongoing but crucial issue.

> Accordingly, we look forward to discussing with ANTHC the following topics tomorrow: (1) ANTHC's assertions regarding Section 325(c) and statewide services, particularly its statements that the PSFAs (or portions thereof) are "not covered by Section 325"; (2) confirmation that ANTHC maintains that no transfer of any PSFAs (or portions thereof) have occurred, but with an explanation of why ANTHC would agree that its PSFAs (that it has now subcontracted with SCF) should appear in SCF's funding agreement; (3) an explanation of how funding / program income received relative to a patient receiving MCH treatment (e.g., from a sub-contracted MFM or Gyn/Onc provider) is received and distributed between ANTHC/SCF under the current revenue sharing arrangement between the parties, and (4) whether that arrangement or process has changed since January 1, 2023, or whether it remains the same as prior to January 1, 2023?

Page 17 – Ms. April Kyle

Ex. 21.  The Agency reiterated its "commitment to working with both sides and [that it] remains interested in learning about the additional discussions between the parties (or additional information that may be provided) since our last meeting in June, as well as working through inconsistencies that have arisen since May." Ex. 21.

### a.  The SCF Asserts an Independent Claim for the Services Under Section 325(d)

On September 15, 2023, the SCF sent two critical updates before its separate meeting with the IHS scheduled for September 18, 2023, which departed from its prior position that it, and the ANTHC, had a sub-contractual arrangement:

> (1) *SCF does not agree that any portion of the MOA to Transfer Maternal Child Health Services Providers is a sub-contractual arrangement between ANTHC and SCF.*  Mr. Olson's prior statement that the section of the MOA addressing payments for speech and language pathology services is a sub-contractual arrangement with ANTHC was made without first consulting me.  SCF apologizes for any confusion Mr. Olson's statement may have caused.

> (2) *You are correct that both SCF and ANTHC believe that the IHS should agree to include the PSFAs specified in the MOA to Transfer Maternal Child Health Services Providers in both SCF's and ANTHC's Funding Agreements.*  However, as I explain in number one above, SCF does not agree that the PSFAs are "subcontracted ANTHC PFSAs."

Ex. 22 (emphasis added in italics).  The IHS provided additional resources and further questions to both the ANTHC and the SCF.  Ex. 23.  Relevantly, the SCF did not challenge the ANTHC's authority regarding Speech and Language Pathology services, which is also reflected in later correspondence.

Relying on Section 325(d) and specifically including references to the Alaska Native Primary Care Center (ANPCC), on October 6, 2023, the SCF subsequently laid out its position: first, the SCF should deliver all Pediatric PSFAs, *except Inpatient Pediatric nursing services and Pediatric Intensive Care Unit (PICU) providers, which are PSFAs possessed by ANTHC*; secondly, the SCF possesses all Maternal-Fetal Medicine PSFAs and Gyn/Oncology PSFAs.  Ex. 24.  The SCF recognized that the ANTHC has legal authority under Section 325(c) to provide inpatient Women's Health nursing. *Id.*[10]

---

[10]  While somewhat dated, additional broad discussion of critical care services at the ANMC can be found here:  ANMC's hardworking Critical Care teams provide lifesaving care for our people | Alaska Native Tribal Health Consortium (from May 21, 2018).

Page 18 – Ms. April Kyle

### b.    The **ANTHC's Disagreed with the SCF's Position Under Section 325(c) Regarding MCH Specialty Services in October 2023**

The ANTHC disagreed with the SCF's statements and clarified the ANTHC's position that:

> . . . [I]t possesses the authority to provide the statewide specialty components of MCH, as it has done since 1999. ANTHC has not transferred that authority to SCF. Rather, ANTHC has transferred personnel through a subcontract, and allowed for SCF to provide those services on the same level and to the same statewide population. Ultimately, ANTHC remains responsible for the provision of these services and at any time could decide to supplement the services being provided by SCF. As such, we must maintain a description of the services in our funding agreement. Had ANTHC intended to transfer full governing authority of the PSFAs to SCF (which would have required ANTHC Board approval and was never contemplated and still hasn't been), the MOA would have said so (instead, it states only that certain *providers* were transferred from ANTHC to SCF).

Ex. 25.

Despite its disagreement, the ANTHC indicated it could theoretically accept the following language relative to the PSFAs in the SCF's funding agreement: "Under subcontract with (or through a subaward), the SCF provides the following statewide specialty services . . . ." *Id.* Additional exchanges ensued that sharpened the parties' divergent views. Exs. 26-27 (with attachments).

The Agency acknowledged receipt of the extensive materials and divergent views and sought to schedule another joint technical assistance session in December 2023. Exs. 28-29.

### c.    The **IHS Asked the SCF and the ANTHC to Clarify or Renegotiate their Relationship and the Terms of the MOA**

In advance of the next anticipated joint technical assistance session in December 2023 the Agency provided a written summary of its understanding of the parties' respective positions at the time, and brief overview of the negotiation history to date, noting that it was not the Agency's final decision relative to the SCF's proposal. Ex. 30. The Agency addressed its understanding regarding Speech and Language pathology, which the SCF acknowledged are and historically were authorized for the ANTHC to carry out under Section 325(c), in contrast to the Southcentral Foundation's position relative to MCH specialty services. *Id.* at 3.

The Agency described the ANTHC's and the SCF's differing and evolving views and highlighted the relevant question of whether the ANTHC transferred PSFAs to the SCF under the MOA:

> This is not a new inquiry. And yet both ANTHC and SCF remain at odds over the answer. Most importantly, the alleged transferor (ANTHC) says it has <u>not</u> transferred PFSAs to SCF. At this point and in terms of next steps, however, *IHS believes that SCF and ANTHC should return to the table to clarify or renegotiate their relationship and the terms of the MOA. And IHS respectfully requests that*

Page 19 – Ms. April Kyle

> *SCF withdraw its current ISDEAA proposal to IHS until additional clarity between ANTHC and SCF can be achieved*. IHS remains available to assist in this process as necessary and appropriate as part of ongoing technical assistance.
>
> *If it is a transfer under Section 325(d), ANTHC should say so, in writing, and ensure that it is approved of by the proper authorities, up to and likely including the ANTHC Board of Directors. This would allow the parties to begin to address a formal transfer between two entities of the applicable services, consider appropriate and applicable funding amounts, and is an activity that IHS has undertaken numerous times in Alaska involving other Tribal Organizations under an analogous provision*, 25 U.S.C. 5386(g). Alternatively, if it is a subcontract, the terms should be made clear, including considering the numerous concerns raised by SCF throughout this process.

*Id.* at 5 (emphasis added in italics).

During a joint meeting on December 11, 2023, between the IHS, the ANTHC, and the SCF, the SCF expressed its disagreement with the Agency's preliminary conclusions, and sought additional time to confer internally, as well as additional technical assistance from the IHS.

**D.    The IHS Provided Additional Technical Assistance and the SCF's Position in Early 2024**

On December 19, 2023, the Southcentral Foundation submitted questions to the IHS and affirmed its two primary legal theories for why the IHS should agree to its FY 2023 proposal regarding MCH.  Ex. 31.

First, the SCF advocated in favor of an independent statutory right under Section 325(d) regarding MCH specialty services, and a transfer of services regarding Speech and Language Pathology services.  *Id.*  In the alternative, the SCF further asserted that the MOA itself satisfied the fourth sentence of Section 325(d) to separately authorize the Southcentral Foundation to carry out additional MCH specialty health care services at the ANMC. *Id.*

On January 3, 2024, the IHS and the SCF met to discuss; the IHS followed up with these questions:

1. According to SCF, what is the Secretarial amount funds allegedly at issue/transferred as to Speech and Language Pathology from ANTHC to SCF;

2. When did ANTHC MFM, Gyn. Onc., and Pediatric subspecialty care services (endocrinology and infectious diseases) begin?

3. Is there any additional information regarding MOA discussions between SCF and ANTHC in the Summer/Fall of 2022, including possible involvement or direction of ANTHC Board of Directors?

Ex. 32.  *See also* Ex. 33 (with attachments).

Page 20 – Ms. April Kyle

In January 2024, the SCF identified its understanding that the ANTHC had begun providing MFM services as early as 2005, and Gynecological Oncology services as early as 2011. Additional identified pediatric subspecialty services through the ANTHC's third-party health care contracts began as early as 2009, and further pediatric specialties expanded in 2011, 2016, and 2017.  Ex. 33.1 at 2.

In addition, the SCF shared its belief that $60,000 represented a good and fair estimate of FY 2024 Secretarial amount funding related to Speech and Language Pathology Services (25 U.S.C. § 5325(a); 25 U.S.C. § 5388(c)).  *Id.*  The SCF was not requesting additional Secretarial amount funds directly from the IHS, though, because it was already being paid by the ANTHC under the MOA ($300,000 per year related to Speech and Language Pathology services).  Instead, the SCF sought to confirm that it was the IHS''s position that the Amendment resulted in "no duplication of Secretarial amount" funding.  *See* Exs. 33.1 at 1-2 and 34.1 at 1-2.

Finally, the SCF also provided additional background and its perspective on the MOA and the ANTHC Board of Director's involvement, or lack of involvement, regarding any theoretical transfer.  This arose in part because there were prior representations by the ANTHC in May 2023 regarding a purported lack of Board involvement.

At the time, the SCF sought no additional Secretarial amount funding regarding Maternal-Fetal Medicine, Gynecological Oncology, or Pediatric Specialty services, despite apparently valuing the programs at issue in the vicinity of $4.8 million to $5.3 million dollars per year.  Ex. 33.1. The SCF reiterated its direct right to the services under Section 325(d), i.e., there was no transfer from the ANTHC needed because the SCF received the services at the outset in the 1990s:

> . . . SCF makes no current claim to any Secretarial amount funding from ANTHC -- and therefore makes no current claim to any Secretarial amount funding from IHS – for Maternal Fetal Medicine, Gynecologic Oncology, or Pediatric Specialties as a result of the executed MCH transfer agreement because SCF first received the Secretarial amount funding for those services on March 1, 1998, and continues to receive such funding today.

*Id.*  The SCF continued to pursue responses to its questions regarding FTCA coverage in addition those raised on December 19, 2023.

### E.    The ANTHC Affirmed Its Position That It Did Not Transfer the MCH Specialty Services to the SCF

On January 26, 2024, the IHS provided the SCF's correspondence to the ANTHC for awareness and then sought specific feedback from the ANTHC. Exs. 35-36.  Among other issues, the Agency sought to confirm that it remained the ANTHC's position that no transfer occurred or was intended under Section 325(d), and the ANTHC views the MOA as a subcontract for the SCF to carry out ANTHC PSFAs now by purchase from the SCF. Ex. 36.

Page 21 – Ms. April Kyle

After multiple follow-ups, the ANTHC substantively responded on March 13, 2024. Exs. 37-39. First, the ANTHC confirmed its position that the MOA only transferred certain *providers*— rather than PSFAs—under Section 325(d). Ex. 39. In addition, the ANTHC explained why it had previously offered to treat the MOA as a subcontract, and that while the ANTHC Board of Directors ". . . considered and approved the transfers of providers reflected in the MOA, *it absolutely did not approve any transfers of any PSFAs to SCF*." *Id.* at 3 (emphasis added).

The ANTHC disputed the relevance of any calculation of Secretarial Amount funds for Speech and Language Pathology, "because the MOA between ANTHC and SCF does not transfer Speech and Language Pathology PSFAs from ANTHC to SCF." *Id.* But the ANTHC appreciated the Agency's suggestion to renegotiate the MOA. *Id.* It was "simultaneously with this email, separately offering to SCF that the parties can either renegotiate the MOA or rescind it." *Id.* The SCF responded on March 21, 2024, asserting that ". . . ANTHC makes several factual misrepresentations that SCF cannot leave unaddressed." Ex. 95 (with attachment).

In early April 2024, the ANTHC indicated it was preparing a draft term sheet for the SCF. Ex. 40. The Agency followed-up as to the status of discussions between the ANTHC and the SCF in late April, and learned that the ANTHC had shared terms on Friday, April 19, 2024. Ex. 41. The IHS also learned that the SCF had rejected the ANTHC's proposal on Friday, April 26, 2024, which the SCF confirmed in writing on May 1, 2024. Exs. 41-42.[11]

In the various correspondence, the SCF communicated: "[t]here is no impasse between SCF and ANTHC." Ex. 45. But the ANTHC indicated elsewhere that it had proposed to the SCF that the parties simply rescind the MOA and transfer the employees back to the ANTHC. *See* Ex. 43. The SCF responded by taking issue with characterizations in the ANTHC's response, focusing on MCH specialty services (including pediatrics) rather than Speech and Language Pathology Services, and reiterating its purportedly steadfast position that the services were properly SCF services and that ". . . ANTHC's buyer's remorse should have no effect on the IHS's decision on SCF's FYs 2023 and 2024 Funding Agreements. As SCF has shown, ANTHC approached SCF with its offer of transferring the services to SCF. SCF agreed." *See* Ex. 46; *see also* Ex. (adding "or pediatrics" to certain paragraphs of prior correspondence to clarify SCF's position.). The SCF formally declined to rescind the MOA. Ex. 47.

Alaska Tribal Health Compact annual funding agreement negotiations for FY 2025, began on May 13, 2024, including with the SCF, the ANTHC, and the 24 other Tribal Co-signers.

## 6.    FY 2025 Annual Negotiations Including MCH Specialty Services, Occupancy and Use, and the ANMC Joint Operating Board

As part of annual FY 2025 negotiations, the Agency initially provided a general update to the Tribal Co-signers on the status of discussions with the SCF and the ANTHC on MCH specialty services and Speech and Language Pathology services. Much of this is set forth above in greater

---

[11] The IHS is not aware of receiving the terms exchanged between the parties but understood the SCF as communicating that ". . . investing time in a counteroffer was not worthwhile." Ex. 43; *see also* Exs. 41 & 45.

Page 22 – Ms. April Kyle

detail, but part of the reason to share this information is because the ANMC sits at the heart of the Tribal health system in Alaska, and as such, is of interest to all Compactors.

In addition to the disputed issues from the prior year between the SCF and the ANTHC, however, two new SCF FY 2025 proposals also implicated the ANMC. First, the SCF proposed language to the section (and header) regarding Executive Direction in Section 3(a)(P), which implicated the ANMC Joint Operating Board (JOB):

> P.    **Executive Direction** Including Executive Direction of ANMC:
> Includes, but is not limited to, program planning, including both strategic and operational planning; financial management; personnel management, and ensuring that the organization meets or exceeds the requirements of regulatory programs.  Includes medical staff office functions including, but not limited to, credentialing, privileging, committee support, and functions related to regulatory requirements.  Includes activities of the SCF Board of Directors, Village Services Management Team, numerous advisory boards, and the appointment of and participation by members of the Alaska Native Medical Center Joint Operating Board.
>
> In collaboration with ANTHC as provided in the Joint Operating Board Bylaws, ANMC policies and procedures, and applicable agreements and arrangements with ANTHC, is responsible for planning, directing, and coordinating services offered by ANMC; resources allocation; credentialing and privileging providers; addressing patient concerns, grievance, and appeals; and maintaining the safety and security of the campus and related programs and facilities.

Ex. 48.2.

Next, the SCF proposed language regarding "Occupancy and Use" of the ANMC to the first portion of Section 3(c), Tribal Facilities, Locations and Personal Property:

> **Tribal Facilities, Locations and Personal Property**. Unless otherwise specified, SCF operates the programs or portions of programs described in this FA out of more than one facility or location and uses personal property owned by the ANTHC, by SCF, and by IHS in some of these facilities and locations.  These include, ANMC, which SCF is entitled to occupy and use, in conjunction with ANTHC.

*Id.*

### A.    The ANTHC Objected to the Executive Direction Proposal and "Occupancy and Use" Proposal

On May 13, 2024, the ANTHC objected to these FY 2025 provisions. Ex. 49.  On May 16, 2024, the ANTHC restated its objections and proposed a possible path forward, which included potential technical assistance, noting: "these issues are of such importance to ANTHC and the statewide Tribal health system that resolving them in the context of bilateral Funding Agreement negotiations—without ANTHC or any other affected cosigners having notice or any consultation—

Page 23 – Ms. April Kyle

would be fundamentally unjust." Ex. 50 (without attachment).  The SCF responded and separately cross-objected to the ANTHC's funding agreement language the next morning. Ex. 51.[12]

Throughout the remainder of the negotiations in May 2024, the Agency and the SCF also had several exchanges on the topic of MCH Specialty Services and Speech and Language Pathology Services.  Critically, the IHS understood that while the SCF may not believe any historical Secretarial amount funds were in play, the SCF *absolutely* maintained—to the extent future MCH Secretarial amount funding became available—that the SCF, rather than the ANTHC, had a right to seek those funds under the ISDEAA, the Compact, and the SCF's reading of Section 325.

The Agency also underscored its understanding that the ANTHC had represented to the IHS (and to the SCF) that the ANTHC did not and does not intend to transfer PSFAs to the SCF.  *See* Ex. 52 at 2.  The ANTHC did not refute the Agency's understanding.

The Agency expressly rejected the SCF's various conclusions and assertions.  Further, the IHS continued to try and look for compromise between the ANTHC and the SCF, and asked the SCF to reconsider its position and return to the table with the ANTHC to reach a more sustainable arrangement.  Of major concern, "[u]nder SCF's approach, the services would appear twice under the *same* Compact, within the *same* facility, and raise distinct and significant risks of duplicative funding and duplicative claims and responsibilities." *See* Ex. 52.

At the close of the annual in-person session, the SCF agreed to further technical assistance relative to the MCH and Speech and Language Pathology.  *See* Ex. 53.  Regarding the subject of Executive Direction, the IHS requested presentations from the ANTHC and the SCF relative to the Joint Operating Board, again, recognizing the complexity of the subject.  And finally, the last item, the "Occupancy and Use" term – was held over for a later date and further negotiations as well.

### B.    SCF's Withdraws Speech and Language Pathology Services

Shortly after the first FY 2025 negotiations session concluded in May 2024, the Agency experienced turnover of critical Area staff, specifically the Agency Lead Negotiator (ALN). *See also* Ex. 90 (with attachment).  The SCF submitted additional correspondence on July 11, 2024, which included historical documentation from the 1990s.  The SCF also further refined its statutory arguments regarding Section 325.  *See* Exs. 54 & 55 (with attachment).

The Agency responded with clarifying questions on July 31, 2024. Ex. 56; *see also* Exs. 57-58.  Then, on Friday, August 2, 2024, the Agency shared that it had identified an ALN for continued FY 2025 negotiations scheduled for August 8-9, 2024, and that the IHS was also prepared to provide continued technical assistance related to the MOA signed by the ANTHC and the SCF. Ex. 59.

---

[12] In general, the Agency is unaware of such a similar circumstance of objections and/or cross objections during annual negotiations under the Compact, at least for many years.

Page 24 – Ms. April Kyle

The Agency continued to try and pursue a way forward despite the fundamental dispute between the SCF and the ANTHC. It noted among other items: ". . . there does not seem to be an argument that Speech & Language Pathology is and has been an ANTHC PSFA. It has been the practice of the Alaska Area/IHS to carry out a full funding determination and related activities only if there is [a] request to transfer. In simple terms, IHS is willing to conduct the transfer work if both parties are in agreement regarding the transfer. Please advise." *Id.*

In a response days later including extensive arguments and legal positions, the IHS was notified among other things that: "**SCF withdraws its proposed amendment for SLP services**. Because it's no longer an issue, SCF will not respond to the IHS's questions/comments about SLP services." Ex. 60.1 at 7; *see also* Ex. 58.

When the parties returned to the continued negotiations on August 8, 2024, and August 9, 2024, the Agency pointed to some of the challenges, including shifting positions adopted by the ANTHC and the SCF about MCH specialty services and the MOA. Among additional next steps, the parties scheduled further technical assistance sessions for August and discussed an additional in-person negotiation session in September 2024.[13]

## C. "Occupancy and Use" Negotiations and MCH Technical Assistance in August 2024

On August 7, 2024, the SCF also revised its "Occupancy and Use" proposal as signaled by the additional green language here:

> **d**e)  **Tribal Facilities, Locations and Personal Property**. Unless otherwise specified, SCF operates the programs or portions of programs described in this FA out of more than one facility or location and uses personal property owned by the ANTHC, by SCF, and by IHS in some of these facilities and locations.  These include, ANMC, which SCF is entitled to occupy and use, in conjunction with ANTHC, so long as SCF carries out the PSFAs described in this Funding Agreement.

---

[13]  After presentations regarding the ANMC Joint Operating Board and discussions regarding ANMC operations, the Agency proposed a joint counter to the SCF and the ANTHC (in response to a joint proposal submitted to the Agency by the SCF and the ANTHC in July 2024) which was ultimately accepted by both parties:

> SCF [ANTHC] participates in the Alaska Native Medical Center Joint Operating Board (ANMC JOB), as provided in the ANMC JOB Bylaws, ANMC policies and procedures, and applicable agreements and arrangements between SCF and ANTHC; the JOB plans, directs, and coordinates  services offered by ANMC, consistent with applicable authorities, including developing, approving, and implementing ANMC's annual operating budget and three-year capital plan; credentialing and privileging providers; addressing patient concerns, grievances, and appeals; overseeing quality of services; and overseeing the safety and security of the campus and related programs and facilities;

*See* Ex. 66; *see also* Exs. 62 (with attachment); Ex. 63 (2024 excerpt only); Ex. 64.

Page 25 – Ms. April Kyle

Ex. 68.1.  The SCF provided the Agency with a handout "on the implementation timeline of Section 325," which the SCF planned to provide to the Tribal caucus, Ex. 68 & 68.2, and later, another document walking through the revised proposal. Ex. 69 (with attachment).

However, the Agency received additional objections from other Co-signers of the Compact on "Occupancy and Use" of the ANMC.  Specifically, the ANTHC transmitted a letter signed by (15) additional parties (plus the ANTHC) on August 8, 2024 which explained:

> *. . . [T]he undersigned co-signers respectfully object to the Funding Agreement proposal made by SCF in May 2024 that would give SCF an entitlement to "occupy and use" ANMC.  The parties to the letter all believe that SCF's proposal is inconsistent with Section 325 and undermines the provision of statewide services that ANMC was established to provide.  SCF's proposal is attempting to re-write the Section 325, a federal law, in its Funding Agreement. The undersigned co-signers believe, if adopted, the language proposed by SCF would create unnecessary ambiguity about which entity is ultimately entitled to own and occupy ANMC. This ambiguity would likely delay ANTHC acquiring ownership of the hospital and the associated funding to provide additional statewide services.*

Ex. 70 (with attachment) (emphasis added).  The SCF responded the next morning, and the Agency asked for clarification.  Ex. 71 (with attachment); Ex. 72 at 1-2.

By later in the day, the number of objecting Co-signers grew from (16) to (19) total.  Ex. 72 (with attachment).  Given the rapidly evolving dynamics, the Agency required additional time to consider the SCF's revised proposal regarding "Occupancy and Use."  And as previously noted, an additional in-person negotiation session was scheduled for September 12, 2024.

### a.  Additional Technical Assistance Regarding MCH Specialty Services and Requests for a "Funding Determination"

On August 9, 2024, as a follow-up to negotiations, the ANTHC requested additional technical assistance on the implications of a transfer of PSFAs to the SCF.  *See* Ex. 74 at 3-4.  This question arose in part due to the Agency's inquiry about whether the ANTHC and the SCF had undergone a separate dispute resolution process, such as mediation, or a third-party alternative dispute resolution process, such as those apparently contemplated under the Joint Operating Board, or, similarly, whether there may be another route forward for the parties to cooperate and reach resolution.

In response to the ANTHC's question, the Agency outlined preliminary considerations, recognizing that under analogous circumstances involving Tribes changing their authorized Tribal Organizations within the State of Alaska, a decision to transfer PSFAs typically comes at the outset, and is followed by a "funding determination" (determining the funding that would have to be awarded for a specific service) and cross-funding agreement language review and renegotiation.  *Id.*  The parties met again on August 15, 2024.

Page 26 – Ms. April Kyle

Following the tri-party meeting, the ANTHC advised the IHS that it had updated the ANTHC Board of Directors and requested that the IHS undertake a funding determination:

> . . . While the Board recognized the need for a resolution if it decides to make the transfer, it also discussed that these are statewide services of critical importance to every Alaska Native family.  Further, the funding determination is different from other transfers. For these reasons, ANTHC believes IHS should deviate from its normal process and begin the funding review now. The Board discussed the need for more financial data and has directed ANTHC staff to work with the IHS to gather the necessary information so the Board can make an informed decision about this issue.

Ex. 74.  The SCF also submitted written comments following the session, and also requested a funding determination.  Ex. 75.

### D.    "Occupancy and Use" and Continued Negotiations in September 2024

In advance of the continued September 2024 annual negotiations session, the IHS received correspondence related to "Occupancy and Use" and additional topics from the ANTHC, the SCF, and additional Co-signers.  Ex. 77 (with attachments); Ex. 91; Ex. 78 (with attachment); Ex. 79; Ex. 80; Ex. 81 (with attachment).

On the morning of September 12, 2024, at the continuation of FY 2025 negotiations, the IHS provided the following counterproposal to the SCF relative to "Occupancy and Use," shown here:

> Section 3(d) – Tribal Facilities, Location, and Personal Property.:
>
> "Unless otherwise specified, SCF uses one or more facilities or locations to operates the programs or portions of programs described in this FA out of more than one facility or location and uses personal property owned by the ANTHC, by SCF, and by IHS in some of these facilities and locations.
>
> SCF is permitted to use the Alaska Native Medical Center hospital, in conjunction with ANTHC, for so long as SCF carries out relevant PSFAs described in this funding agreement relative to the ANMC hospital and in accordance with applicable authorities, including Section 325(d) of P.L. 105-83."

Ex. 82.  Later that day, and relevantly, the SCF thanked the Agency for the counterproposal, but indicated it needed additional time to consider, thereby formally pausing its funding agreement negotiations.

At the table, the Agency also provided the Co-Signers with an update on MCH specialty services technical assistance, including the Agency's ongoing review of historical documents, that the Agency's position stated in May 2024 relative to Maternal-Fetal Medicine or Gynecological Oncology was unchanged, but that the IHS was still considering its position relative to pediatric subspecialty services.  The Agency shared that it planned to provide a draft funding

Page 27 – Ms. April Kyle

determination, which in standard practice would typically involve feedback from interested parties (Tribes or Tribal Organizations) prior to a final decision by the IHS.  *See also* Ex. 83.

On October 11, 2024, the IHS shared the Agency's draft funding determination with the ANTHC and the SCF.  Ex. 84 (with attachment).  The SCF responded with its perspective and questions on October 18, 2024, and the Agency provided additional information and explanations on October 29, 2024.  Ex. 83; Ex. 86 (with attachments).  After further exchanges, by which the SCF communicated its belief that the Agency had committed (in September 2024) to providing a counterproposal to the SCF's MCH specialty services language, the Agency clarified that it did not commit to a counteroffer but that it nevertheless continued to work through next steps, including a one-on-one meeting with the ANTHC during the week of November 18, 2024. *See* Exs. 87-88.  The SCF and the IHS met again on November 22, 2024, after the ANTHC meeting.

The SCF Final Offer insinuates that the purpose of the Agency's meeting with the SCF on November 22, 2024, was related to the "Occupancy and Use" Proposal.  Rather, the intended focus from the Agency's perspective was MCH specialty services and the draft funding considerations, since the topic remained in a technical assistance posture.  Typically, during funding determinations, the Agency may meet with each interested side prior to a tri-party meeting to ensure open communication.  Here, the Agency pursued this course and recommended a tri-party meeting between the ANTHC, the SCF, and the IHS for December and invited the parties to potential dates on December 11, 18, 19, and 20, 2024.  *See* Ex. 89.

The SCF states in its Final Offer, though, "[o]n September 12, 2024, the ALN offered a counter proposal that significantly changed Section 3(c) of the funding agreement.  SCF met again with the ALN to discuss its concerns with the changes and asked repeatedly for explanations to justify IHS' alternative language, particularly because the ALN's provision created unnecessary ambiguity and reduced SCF's legal right to occupy and use the ANMC hospital building.  The ALN did not share any information."  The Agency assumes that when the SCF says that it "met again" with the ALN, it is referencing the MCH specialty services proposal technical assistance session on Friday, November 22, 2024.

Regardless, the Agency respectfully disagrees with the characterization that the SCF "asked repeatedly for explanation to justify IHS' alternative language" regarding "Occupancy and Use." When the SCF broached the topic on November 22, 2024, the IHS stressed a willingness to listen, that preparation to address the specific topic was limited, and that the Agency had understood that the SCF (not the IHS) had specifically elected to "pause" negotiation of the proposal in September 2024.  The Agency separately finds the SCF's Final Offer characterization that there has been "little or no engagement from IHS" as to SCF's FY 2023 MCH amendment, or elsewhere describing the Agency as "nonresponsive," simply inaccurate.

After listening to the SCF's concerns regarding "Occupancy and Use" terms during the November 22, 2024, meeting, the Agency suggested that the SCF capture those concerns in writing and share them.  In effect, this would allow the SCF to identify the legal considerations that the SCF wished the Agency to consider in specific detail, but also signal to the Agency and

Page 28 – Ms. April Kyle

the other 25 Co-signers of the Alaska Tribal Health Compact—which had expressed deep interests in the subject—the desire to restart negotiations on this topic that the SCF had opted to stay.  The Agency believed that the SCF would express an interest in restarting discussions with other pertinent Tribal stakeholders across the Compact, including the ANTHC.  Instead, the Agency received a final offer regarding "Occupancy and Use," the SCF Final Offer at 1-2, 4-5 & Attachment. 1, but also MCH Specialty Services.  SCF Final Offer at 2-4, 5-6 & Attachment 2.[14]

For the reasons set forth below, the IHS respectfully and fully rejects the SCF's Final Offer.

## **Response to the SCF's Final Offer**

I.    **The IHS Rejects the Southcentral Foundation's Proposal to add MCH Specialty Services to its Funding Agreement**

The text and structure of Section 325 of Public Law 105-83, as well as the relevant background facts here, show that the MCH specialty services at issue in this Final Offer—including Maternal Fetal Medicine, Gynecological Oncology, and various pediatric subspecialties—are not "primary care" services and may accordingly only be carried out by the ANTHC in the ANMC hospital.  Moreover, the ANTHC—the entity with authority under Section 325(d) to agree to transfer services to the SCF—has represented that it has not done so.

### A.    Section 325(a) and (c) Support a Broad Authority for the Consortium

Section 325 provides a broad authority relative to the ANMC services of the "Consortium."  Initially, the statute states "[n]otwithstanding any other provision of law," the identified regional health entities are authorized to form a "consortium" to enter into ISDEAA contracts, compacts, or funding agreements "to provide *all* statewide health services provided by the Indian Health Services . . . through the Alaska Native Medical Center and the Alaska Area Office." Pub. L. No. 105–83, § 325(a), 111 Stat 1543, 1597 (1997) (emphasis added). *See Southcentral Found. v. Alaska Native Tribal Health Consortium*, 983 F.3d 411, 417 (9th Cir. 2020) (citing *United States v. Gallegos*, 613 F.3d 1211, 1214 (9th Cir. 2010) ("The starting point for our interpretation of a statute is always its language.")).

Section 325(c) further provides that the "statewide health services (including *any* programs, functions, services and activities provided as part of such services) of *the Alaska Native Medical Center* and the Alaska Area Office may *only* be provided by the Consortium. Statewide health services for purposes of this section *shall consist of all* programs, functions, services, and activities provided *by or through the Alaska Native Medical Center* and the Alaska Area Office,

---

[14] On December 10, 2024, prior to submission of the Final Offer, the SCF also submitted multiple additional amendments for final review and execution (Am. 2 (FY 2024), Am. 3 (FY 2024), Am. 5 (FY 2025), and Am. 6 (FY 2025), which the Agency understands does not include MCH specialty services or "Occupancy and Use" that are the subject of the Final Offer.  To the extent there is any overlap, including out of oversight, the Agency has sought their removal consistent with the prior understanding that the SCF would sever the MCH specialty services issues, and "Occupancy and Use" issues, from the SCF's other separate proposals.

Page 29 – Ms. April Kyle

not under contract or other funding agreement with any other tribe or tribal organization as of October 1, 1997, except as provided in subsection (d) below." 111 Stat. 1543, § 325(c) (emphasis added). By using terms such as "all," "any," "only," and "shall," Section 325's text and structure instruct that the contractable PSFAs of the ANMC not under contract as of October 1, 1997, or otherwise exempted under subsection (d), flow to the ANTHC.[15]

Recognizing that Section 325(a) and (c) weigh against the SCF's position, the Final Offer focuses almost exclusively on the exception to (a) and (c) under Section 325(d). The SCF seeks to make the exception into the rule, and it fails to closely read Section 325(d), which does not support its conclusions.

> **B.    The PSFAs at Issue Are Not "Primary Care" Services and the SCF Accordingly Does Not Have Authority to Include Them in its Funding Agreement**

Beginning again with the text, Section 325(d) provides four distinct clauses relevant to this final offer. First, Section 325(d) removes the resolution requirement of the ISDEAA for CIRI, through SCF, for all services of the Alaska Native *Primary Care* Center (ANPCC): "(d) Cook Inlet Region, Inc., through Southcentral Foundation (or any successor health care entity designated by Cook Inlet Region, Inc.) pursuant to Public Law 93–638 (25 U.S.C. 450 et seq.), as amended, is hereby authorized to enter into contracts or funding agreements under such Public Law for *all services provided at or through the Alaska Native Primary Care Center* or other satellite clinics in Anchorage or the Matanuska–Susitna Valley *without submission of any further authorizing resolutions* from any other Alaska Native Region, village corporation, Indian Reorganization Act council, or tribe, no matter where located." 111 Stat 1543, § 325(c).

The text of the first clause follows analogous language in Section 325(a) to remove the resolutions requirement otherwise imposed to address the difficulty of the governance structure that would normally require resolutions. *See* 25 U.S.C. § 5304(*l*); *see also Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 989-990 (9th Cir. 1999) (resolving as moot a challenge to the CIRI/SCF compact citing Section 325(d) stating that the "legislation effectively removed any claim or requirement for approval" by the Villages). But rather than read this sentence as addressing the resolutions requirement as to the ANPCC, the SCF reads this sentence a-textually to expand without limits its own authority relative to the ANMC. This approach ignores the plain text, however, and lack of reference to the ANMC in the clause itself.

The second clause of Section 325(d) focuses on ensuring that CIRI/SCF provided a minimum level of statewide and Anchorage Service Unit services via the ANPCC: "*Services provided under this paragraph* shall, at a minimum, maintain the level of statewide and Anchorage Service Unit services provided at the Alaska Native *Primary Care* Center as of October 1, 1997, including necessary related services performed at the Alaska Native Medical Center." (emphasis

---

[15] As noted above, the legislative context provides: "The Committee further intends, by these provisions, to keep the statewide services of the Alaska Native Medical Center and the Alaska area office intact in Anchorage and managed by the new consortium, with the exception of primary care services." S. Rep. 105-56, 110.

Page 30 – Ms. April Kyle

added).  This "minimum level of statewide services" sentence provides, in its trailing clause, a reference to ANMC that substantively relates to establishing the minimum level of *primary care* service mandate that extends to "necessary related services performed at the Alaska Native Medical Center."

Indeed, the focus of the second provision remains on the primary care services and the Alaska Native *Primary Care* Center, which is also supported by the legislative record: "The Committee bill directs Cook Inlet Region, Inc., through Southcentral Foundation, or any lawfully designated health care entity of Cook Inlet Region, Inc., to enter into a funding agreement with the Indian health service to provide *all primary health care services* now being provided by the Alaska Native Primary Care Center and the Alaska Native Medical Center, including through satellite clinics, in order to encourage the efficient management of *primary care services* provided by both the ANPCC and the ANMC." S. Rep. 105-56, 110 (emphasis added).

To achieve its desired outcome to independently provide the ANMC specialty services at issue in this Final Offer, the SCF tries to read "primary care" out of Section 325(d) in two fundamental ways.  Initially, the SCF overreads the first two sentences of the subsection, which it tries to unify, while disregarding additional express terms: basically, "SCF is statutorily entitled to provide MCH Services at ANMC, so long as they are provided at or through ANPCC." *See* Final Offer at 6.  However, this is not what the first two sentences provide.

But even more critically, the SCF also then largely disregards the third and fourth sentences of the subsection in its analysis.  Indeed, the third clause (rather than the first two) expressly addresses "primary care" services provided by the ANMC: "*In addition*, Cook Inlet Region, Inc., through Southcentral Foundation, or any lawfully designated health care entity of Cook Inlet Region, Inc., shall contract or enter into a funding agreement under Public Law 93–638 (25 U.S.C. 450 et seq.), as amended, *for all primary care services provided by the Alaska Native Medical Center*, including, but not limited to, family medicine, primary care internal medicine, *pediatrics*, *obstetrics and gynecology*, physical therapy, psychiatry, emergency services, public health nursing, health education, optometry, dentistry, audiology, social services, pharmacy, radiology, laboratory and biomedical, and the administrative support for these programs, functions, services and activities."

Simply put, if Congress had authorized CIRI/SCF to carry out "all services" provided by the ANMC at CIRI/SCF's own election, i.e., "through" the ANPCC or other satellite clinics, it would have done so in clearer terms rather than the a-textual approach that SCF now advocates. For example, Congress could have expressly provided for *all* internal medicine ANMC services to CIRI/SCF, but it instead limited those services to CIRI/SCF by using the term "primary care." Congress could have also expressly authorized CIRI/SCF to provide cardiology, or gastroenterology, among other broader internal medicine subspecialty care services, but it instead restricted it by specifically including the term "primary care internal medicine."

Indeed, Congress provided no expansiveness relative to the ANMC in Section 325(d); instead, it favored a broad construction for the term "statewide services" under Section 325(c) and drew the boundary in favor of the Consortium.  Recall, Section 325(c) provides that "statewide health

Page 31 – Ms. April Kyle

services (including *any* programs, functions, services and activities provided as part of such services) of *the Alaska Native Medical Center* and the Alaska Area Office may *only* be provided by the Consortium." Pub. L. No. 105–83, § 325(a), 111 Stat 1543, 1597 (1997).  Note as well that the SCF's current funding agreement for FY 2023 provides the following in the first sentence relative to Pediatrics: "Provides pediatric services on a *primary care* basis." Ex. 2 at § 3(a)(K) (emphasis added).

The statute's express terms apply with equal force to limit CIRI/SCF's authority to primary care OB/GYN and Pediatrics under Section 325(d) relative to the ANMC.  As noted, primary care generally includes health promotion, disease prevention, health maintenance, counseling, patient education, and diagnosis and treatment of acute and chronic illnesses, which are generally offered by various provider types, including family medicine physicians, general internal medicine physicians, general pediatricians, and general practice physicians of Obstetrics/Gynecology, including further allied practice providers.  But "primary care" services are readily distinguishable from the highly specialized services of Maternal-Fetal Medicine, Gynecological Oncology, and, for example, pediatric plastic surgery, which are the services at issue through this Final Offer.[16]

Finally, the Section 325(d) sentence that follows the "primary care ANMC clause," also provides more context by authorizing "additional health care services" by agreement with the Consortium. It states: "Cook Inlet Region, Inc., through Southcentral Foundation, or any lawfully designated health care entity of Cook Inlet Region, Inc., *may provide additional health care services at the Alaska Native Medical Center if such use and services are provided pursuant to an agreement with the Consortium*."  The natural reading of the statute is that the "additional health care services at the Alaska Native Medical Center" follows from the prior sentence that expressly sets forth the "primary care" services by the ANMC list, rather than another aspect of provision related to ANPCC.[17] It also solidifies the role of the Consortium in determining additional non-primary care services at the ANMC.

---

[16] In many respects, the SCF has acknowledged that the ANTHC has authority to provide unique specialty/subspecialty services related to Pediatrics in the ANMC, such as through the Pediatric Intensive Care Unit (PICU), *see e.g.*, Ex. 24. The ANTHC shared that even after the execution of the MOA discussed above, that it employed seven physicians, six presumptive pediatric specialists, plus a Maternal-Fetal Medicine physician, related to Family Birthing Services, the PICU, and the Neonatal Intensive Care Units. *See* Ex. 16.2.  The IHS understands the SCF to argue that as to one provider, presumptively the MFM physician, that the ANTHC and the SCF separately negotiated for the provider to remain with the ANTHC until retirement, while the SCF would reimburse the ANTHC. Ex. 33.1 a n1. But this does not help the SCF's main statutory argument.  Indeed, the SCF further highlights the distinction between "primary care" OB/GYN and Maternal-Fetal Medicine in the language it proposes in the Final Offer by distinguishing between OB/GYN physicians and MFM Physicians to address: "high-risk pregnancies for women and fetuses who have complications identified prior to or during pregnancy. . . . The *Maternal-Fetal Medicine Physicians* (perinatologists) *work collaboratively with the OB/GYN physicians and certified nurse midwives* . . . ." Final Offer at FY 2023 Amendment Section 3(a)(L) (emphasis added). In short, the hyper-specialized OB/GYN services (perinatology) of the ANMC are distinguishable from the "primary care" services available through a general practice OB/GYN provider.

[17] As noted, Gynecological /Oncology is also a form of surgical cancer sub-specialization, which is also distinguishable from "primary care" OB/GYN care, just as "Pediatric Plastic Surgery-Cleft Lip & Palate" is distinct

Page 32 – Ms. April Kyle

In short, the services at issue in the final offer—Maternal Fetal Medicine, Gynecological Oncology, and additional pediatric subspecialties such as pediatric surgery (MCH specialty services) of the ANMC— are not "primary care" services for purposes of Section 325(d). They do not meet the plain language of the modifier "primary care" of Section 325(d), nor do they meet with any common sense or technical meaning of the phrase "primary care" pediatrics or "primary care" OB/GYN. Nor do they align with Congress's established framework. To conclude otherwise would be to construe "all primary care services" under Section 325(d) to read as simply "all" services, or alternatively all "primary and *any related subspecialty*" (largely focused on exclusively physicians) ANMC services, which is contrary to the express terms of the statute and Congress's intent.[18]   Therefore, the SCF has no authority to add these services to its funding agreement.

### C.    The Factual Record Also Supports that the Services at Issue are not "Primary Care" Services

Consistent with the foregoing, the available factual record also supports that the services at issue are not "primary care" services under Section 325(d). Historically, the ANTHC received funds in the category of "Women's Health" and "Pediatric MGNT" in 1999 in the totals of $2,287,676 and $2,267,476, but which was distinguished from the Women's Health-PCC line and Ped MGNT – PCC funding lines. Ex. 15.1 at 2. Descriptors from that timeframe include "Women's Health – Inpatient OB/GYN services" – 100% ANTHC program, and "Pediatric Management – Inpatient pediatric services – 100% ANTHC program." Ex. 15.1 at 9.

Additional ANTHC surgical lines include "Surgical Service Line – 100% ANTHC program" and "Outpatient Surgery – 100% ANTHC program." *Id.* at 10. Further, there is also a specific note of an allocation to the ANTHC relative to an "Community Health Services OB Consultant," already being funded to ANTHC in Budget Part I. Ex. 15.1 at 3 & 12.[19]  The SCF basically argues that the foregoing does not support the conclusion that the ANTHC originally received

---

[17] from "primary care" pediatrics. *See* Ex. 5.1 at App. C. Nevertheless, the SCF seeks to add the sweeping term "pediatric surgeries," which are "provided at ANMC," to its funding agreement. Final Offer FY 2023 Amendment; *see also* Ex. 94 at §§ 3.1.7.1.8 & 3.1.7.1.11 (ANTHC provisions including "plastic and reconstructive surgery services" and "oral surgery").

[18] If accepted, the SCF's assertions would have widespread ramifications because the services identified under the "primary care" list includes many further subspecialties. This includes in the field of OB/GYN, for example, Reproductive Endocrinology (REI). But the SCF's approach would also be especially impactful to "primary care internal medicine," which specifically repeats the guardrail of "primary care" that SCF's a-textual interpretation would read out and expand to various subspecialties, potentially including cardiology, urological care, critical care medicine, pulmonology, among many others, including which appear in various additional sections of the ANTHC's funding agreement. Ex. 94 at §§ 3.1.7.1.1, 3.1.7.1.3, 3.1.7.1.8, 3.1.7.1.13.

[19] The reference: "Community Health Services OB consultant- This funds the recently created OB consultant position in CHS. These funds are already in the ANTHC budget in part I, but come from the ANMC budget. The allocation to the SCF is based on the general allocation methods - no buyback (note the actual amount of funds transferred to the ANTHC was 100 percent, however, this was not done with SCF approval - the 32 percent SCF share must be funded from other ANMC/ANTHC resources.)"

Page 33 – Ms. April Kyle

funding related to the specialty PSFAs at issue (MFM, Gyn/Onc, or pediatric subspecialty services), but the more salient conclusion is that the ANTHC received funding for MCH services because Congress placed limits on the scope of the SCF's authority.

Nevertheless, the Secretarial amount funding picture related to the services at issue is difficult to trace to the late 1990s, in part because categories of funds are provided under broad descriptors, such as "Hospitals & Clinics (H&C)," rather than individual line items.  However, the IHS identified that additional funds were awarded to the ANTHC in 2002 related to a MCH program manager, in the sum of $110,039 (annualized in 2003). Ex. 86.1 at 9.  This too supports the conclusion as to all parties' understanding of the SCF's limited scope.

Historical budget documents indicate SCF funding for "primary care" services:

- o SCF Family Medicine – SCF Completed its acquisition of 100% of the Family Medicine program in Part 1, except for funding for supplies for the program which has been left with ANTHC (see assurances).

- o Audiology Service – 100 % Primary Care service to be operated by SCF.

- o Public Health Nursing – These funds were contracted by SCF in Part 1.

- o Optometry. 100% Primary Care service to be operated by SCF.

- o Dental Service. 100% Primary Care service, _with the exception of 50% of three specialists and 50% of three assistants (oral surgeon and pediatric dental specialists)_, which are allocated to ANTHC.  The entire department is to be operated by SCF, so the buyback is from ANTHC to SCF and represents 100% of the funding.

- o Mat-su Clinic – Funding to operate the Mat-su clinic.  These are only the 106(a) amount and are 100% SCF operated.

Ex. 15.1 at 10-12 (emphasis added).  Indeed, the distinction between "Dental" and "Oral Surgery" is instructive here as well, because one is expressly provided as a "primary care" service of Section 325(d), dentistry, but adjacent non-primary (specialty) services was awarded to the ANTHC.  The SCF seeks to undermine this framework through its Final Offer.

Finally, the discussions with the ANTHC and the SCF also establish the following relevant facts:

(1) ANTHC began providing MCH specialty services years ago, including perinatology through a maternal-fetal medicine provider as early as 2005, Gynecological Oncology services as early as 2011, and additional pediatric subspecialty services (nephrology, child development, infectious diseases, additional pediatric subspecialty) in the years between 2009 and 2017.  _See_ Ex. 33.1 at 2.

Page 34 – Ms. April Kyle

(2) At least as to MFM and Gyn/Onc, the SCF understood the previously longstanding position of the ANTHC "that because these were not specific separately identifiable specialty services provided by ANPCC/ANMC as of 10/1/1997, they were an ANTHC obligation."  Ex. 5.  But the SCF also stated: "At 10/1/1997, MFM and Gyn-Onc services did not exist as separate specialties at ANMC/ANPCC." *Id.*  Despite apparently disputing the ANTHC's authority, so far as the Agency is aware— the SCF has not previously challenged the ANTHC's authority, including through a Final Offer or other means, despite the ANTHC providing services for years under the Alaska Tribal Health Compact. *Id.*  This highlights the untimeliness of the SCF's present assertions.

(3) The SCF recited the ANTHC's authority in the MOA between the parties:

> ANTHC provides Maternal Child Health services at the Alaska Native Medical Center ("ANMC"), which includes Maternal Fetal Medicine, Inpatient Women's Health services, OB GYN Oncology services, Inpatient Pediatric services, and Pediatric subspecialty services (the "MCH Services");

Ex. 5.1 at 1. SCF attempts to disregard the recital as a "mere statement of a current fact" to justify the MOA, but this does not the lessen the admission.   Ex. 60.1.

(4) The ANTHC provided Speech and Language Pathology services through the ANMC and received funding for it, and though there has been no contemporary valuation of the services in terms of Secretarial amount from the Agency (as it was no longer requested as of August 2024), the services are absent from the list of "primary care" ANMC services listed under Section 325(d).  As noted above, the SCF also withdrew this issue entirely in August 2024, which again supports the Agency's position.  *See* Ex. 60.1.

Consistent with text and context of Section 325, the ANMC specialty services at issue are not "primary care" services through the ANPCC and accordingly do not fall under CIRI/SCF's authority under Section 325(d) to provide in the first instance, or as a matter of independent statutory right.  The factual background and negotiations history of this dispute likewise support this conclusion.[20]

---

[20] While the historical picture lacks exacting clarity, in addition to the passage of decades, some services that were initially assigned to both the ANTHC and likely the SCF were bought back from the Agency.  This meant that at least for a time, the Agency continued in practice to carry them out through the transition for one or both entities.  Similarly, the ANTHC (including once established) and the SCF purchased services from one another for operational reasons from time to time.  And finally, both the ANTHC and the SCF have authority to redesign or consolidate PSFAs under their respective funding agreements, 25 U.S.C. § 5386(e), which has undoubtedly occurred in ways, both small and large, but which makes perfect clarity on the inner workings of self-governance from 25 plus years ago difficult to achieve.  As the legislative history comments about the time: "[m]anagement of the Alaska Native Medical Center and the Alaska area office will be the largest self-governance contract yet to be negotiated under Public Law 93–638, with an annual operating budget approaching $100,000,000."  S. Rep. 105-56, 109-10.

Page 35 – Ms. April Kyle

### D.    SCF's Additional Section 325(d) Arguments Are Unpersuasive

The SCF has repeatedly shifted its arguments to justify pursuit of the PSFAs at issue in its funding agreement, which are ultimately unpersuasive.  Initially, the SCF argued that the services did not exist as of October 1, 1997, specifically MFM and Gyn/Onc and purportedly involved a transfer.  *See* Ex. 5.  Then the SCF argued that there were aspects that were mutually sub-contractual, before the SCF reversed and advocated for an independent statutory right, at least for some of the services under the MOA, with a transfer for Speech and Language Pathology, or alternatively a transfer for MCH Specialty Services at the ANMC.

But the SCF recently has further extended its position that in the 1990s the IHS determined and acknowledged "that SCF possesses an independent statutory right to provide MCH Services, and no evidence has ever been produced to indicate a formal change in the government's position." *See* SCF Final Offer at 6.  In crafting this new argument, the SCF ignores the foregoing background and its own representations and arguments throughout. Instead, SCF essentially goes yet farther back in time.[21]

The SCF's basic conclusion is that the SCF contracted the services at issue in the 1990s (at least in part).  Yet, it is abundantly clear from the record that the ANTHC has been providing the ANMC specialty services at issue for years, and that the SCF understood the ANTHC to claim authority over the PSFAs, including under prior ANTHC administrations, which also explains why the SCF apparently pursued terms to perform the services with the ANTHC in 2022.  If the SCF's most recent assertions were true, the first unavoidable conclusion is that the ANTHC arguably acted without authority for years under Section 325 and provided millions of dollars of services, which the SCF arguably was required to/contracted to perform (at least in part) or had exclusive authority to perform at the ANMC, under the same statute.[22]  And, moreover, the SCF was aware of the ANTHC's performance.

---

[21] The Agency also understood the basic argument, at least one point in time from both the ANTHC and the SCF, was that because none of the services at issue under the MOA were historical, i.e., that they were expanded services, and that the Assurances were not implicated by the parties' activities.  Similarly, this would mean that the "minimum level of service" aspect of Section 325(d) was not invoked, either.  *See* Ex. 2.1 at App. J.

[22] Notably, the Compact itself provides the following in the preamble in terms of the relationship between ANTHC and Section 325:

> WHEREAS, for purposes of clarification, and to recognize the government to government relationship between the signatory Tribes and the Secretary, the parties agree that the signatory Tribes, by entering into this Compact, do not relinquish any aspects of Tribal sovereignty to the Co-Signers.  The Tribal Co-Signers act only for and on behalf of the signatory Tribe(s) within the scope of the authority granted to them by tribal resolution or by law *and the ANTHC has only the authority granted to it under section 325 of P.L. 105-83*.  Tribal CoSigners and the ANTHC by carrying out the terms of this Compact and the associated Funding Agreements do not gain the status of a sovereign tribal government;

Page 36 – Ms. April Kyle

The SCF's varying contentions are contradictory and unpersuasive.[23]  The Agency declines to accept them, including the assertion that it compacted for ANMC perinatology services with the SCF, when it has expressly compacted those in the ANTHC's funding agreement years later. Ex. 94 § 3.1.7.1.10.  The same goes for Gyn/Onc services, and pediatric subspecialty services that include the broad exemplar category of "pediatric surgery."

Ultimately, the statute makes it clear that the SCF is not authorized to add specialty services like pediatric plastic surgery at the ANMC to its funding agreement, including under the auspices that they are "through" the ANPCC or other satellite clinic, because they are not "primary care" services.  And, the SCF lacks the ANTHC's agreement under the ISDEAA and Section 325(d) to provide the additional specialty services at issue here.[24]

### E.     The MOA is not an "Agreement" for Purposes of Section 325(d), and the ANTHC Has Stated that It Has Not Agreed

The SCF also argues that the services it seeks to include in its funding agreement should be added pursuant to the MOA between the ANTHC and the SCF, and in accordance with the "additional health care services at the Alaska Native Medical Center" sentence of Section 325(d). Final Offer at 7.  As discussed, Section 325(d) provides: "Cook Inlet Region, Inc., through Southcentral Foundation, or any lawfully designated health care entity of Cook Inlet Region, Inc., *may provide additional health care services at the Alaska Native Medical Center if such use and services are provided pursuant to an agreement with the Consortium.*" (emphasis added). The Agency rejects the conclusion that the current MOA satisfies this alternative.

---

Ex. 1 at 6 (emphasis added).

[23]  The SCF asserts that its Feb. 10, 1998, submission references high risk and subspecialty care throughout the State. Ex. 55.1 at Doc. 1 (citing excerpts of 2/10/98 Revision Three Contract Application for the Anchorage Primary Care Center); *see also* Ex. 93 (Final Contract Application); Ex. 92.  But, to the extent there are words such as "high risk" or "specialty," in historical documents, these terms can have various meanings, including for example, as between care provided by a family medicine physician who may perform deliveries, in contrast with a general practice OB/GYN.  Indeed, one can also be both a specialist in family medicine but also a primary care OB/GYN that is distinguishable from a MFM physician and Gyn/Onc, both of which are further subspecialties that are not "primary care."  The documents that the SCF shared also state that "[c]are *absent* from the Women's Health Program and *referred to other facilities* is management of anticipated deliveries of infants at or below 32-34 weeks gestation *or diagnosed with congenital anomalies requiring surgical intervention*." Ex. 55.1 at 12. But SCF's current proposal for MFM identifies services for "high risk pregnancies for women and fetuses who have complications identified prior to or during pregnancy." *See* Final Offer FY 2023 Amendment; *see also* Ex. 33.6; *cf.* Ex. 57 (Noting ". . . as some of these high-end specialists were not practicing in Alaska in 1998," which presumptively is in minimum reference to MFM and Gyn/Onc).  The current proposal for ANMC specialty services also includes pediatric infectious diseases, rheumatology, cardiology, genetics, rehabilitation medicine, and pediatric surgery.  *See* Final Offer FY 2023 Amendment.

[24]  Based on various arguments, it is also possible to conclude that there is a fundamental challenge to the permanence of Section 325, which the SCF seeks to take on unilaterally by way of the Final Offer, when the ANTHC's position regarding the transfer is clear.  Whether temporal or by redesign, such a challenge is unsupported, as the text, structure, and context all support the conclusion that Congress intended to provide ongoing authority for Tribal management in the year of enactment, as well as future years; Section 325 is permanent legislation.

Page 37 – Ms. April Kyle

More importantly, the ANTHC has repeatedly stated and represented that it has not reached agreement with the SCF to transfer/provide additional health care services.

First, as the history above establishes, there fundamentally is no agreement between the ANTHC and the SCF as to the meaning of the current MOA.  The ANTHC has also stated and represented that it has not agreed that the SCF can provide additional health care services under Section 325(d), i.e., that there was no transfer or authorization for a transfer.  Because the ANTHC is the entity that must express its agreement and it emphatically has not done so, the inquiry into additional health care services ends there.

Furthermore, both the ANTHC and the SCF undermine aspects of the MOA, by minimizing the recitals that expressly acknowledge the services at issue, and emphasizing terms such as "providers" over "services."  Or by accepting that aspects of the arrangement were sub-contractual, only to later refute those assertions completely weeks later.  As time has gone by, disagreement, rather than agreement, has been communicated through tone, word, and representation, and is the unfortunate but singular takeaway.

Despite the requests for the parties to clarify their arrangement in December 2023, the SCF and the ANTHC rejected one another, and the SCF also rejected the recission of the MOA altogether.  The SCF also appears to construe the potential for "additional health care services" of the AMNC authorized by the ANTHC as a self-locking door that, once passed, the services can never reenter the ANTHC.  And though there appears no such restriction under the language of Section 325(d) in terms of reversing a theoretical transfer, by using the Final Offer process, the SCF seeks to compel the IHS by law to award services when the authorizing entity, the ANTHC, has repeatedly represented it did not.  *See* Ex. 39 at 3 (providing "The ANTHC Board did not approve any transfers of any <u>PSFAs</u> from ANTHC to SCF under Section 325(d), however. The same is true as to the speech and language pathology provisions of the MOA – the ANTHC Board never approved a transfer of those PSFAs to SCF." And separately providing: "So, while the ANTHC Board considered and approved the transfers of providers reflected in the MOA, it absolutely did not approve any transfers of any PSFAs to SCF.") (emphasis in original)." *See also* Ex. 58; Ex. 74.

An additional, but crucial example that supports the lack of agreement to transfer, involves Speech and Language Pathology services, which is an express aspect of the MOA.  First, the services fell undisputedly within the purview of the ANTHC for purposes of Section 325; nevertheless, in August 2024, the SCF *withdrew* its pursuit of the transfer of this service, including potentially associated funding.  *See* Ex. 60.1 at 7; *see also* Ex. 33.1 at 1-2. A straightforward conclusion to draw from this sequence is that the MOA actually was not intended as a transfer agreement in the first instance, because the SCF is no longer pursuing it as such.

Finally, the SCF directs the Agency to no authorizing resolution on behalf of the ANTHC Board of Directors regarding the alleged transfer.  And 25 U.S.C. § 5381(b) relevantly contemplates an authorizing resolution for such activity: "[i]n any case in which an Indian tribe has authorized another Indian tribe, an inter-tribal consortium, or a tribal organization to plan for or carry out programs, services, functions, or activities (or portions thereof) on its behalf under this

Page 38 – Ms. April Kyle

subchapter, the _authorized_ Indian tribe, inter-tribal consortium, or tribal organization shall have the rights and responsibilities of the _authorizing_ Indian tribe (_except as otherwise provided in the authorizing resolution_ or in this subchapter). In such event, the term "Indian tribe" as used in this subchapter shall include such other authorized Indian tribe, inter-tribal consortium, or tribal organization."

In light of the foregoing and the months of effort to try and bring the parties closer together, the Agency must respectfully reject the SCF's Final Offer to transfer the complex, broad, and highly specialized ANMC services at issue, including Maternal Fetal Medicine, Gynecological Oncology, and numerous pediatric subspecialties such as "pediatric surgery," which the ANTHC maintains it did _not_ agree to transfer under Section 325(d), or the ISDEAA.

     **F.**     **The IHS Rejects the SCF's Request to add MCH Specialty Services in Accordance with 25 U.S.C. § 5387(c)**

          **a.**     **The <u>SCF is not Entitled to Additional Funds, including Contract Support Costs (CSC) Under 25 U.S.C. § 5387(c)(1)(A)(i)</u>**

The IHS rejects the SCF's Final Offer in accordance with the criteria set forth in 25 U.S.C. § 5387(c). First, a Tribal Organization cannot receive more funding than that to which it is entitled. _See_ 25 U.S.C. § 5387(c)(l)(A)(i); 42 C.F.R. § 137.140(a). By way of reminder, under the ISDEAA, contractors receive the Secretarial amount, CSC, and sometimes Section 105(_l_) lease compensation. 25 U.S.C. §§ 5325(a)(1), 5325(a)(2)-(6), 5324(_l_). In its final offer and undoubtedly by design, the SCF does not explicitly seek additional funding.

However, the SCF has represented to the IHS that should additional MCH funds become available in future years, it would seek to claim them. _See_ Ex. 52. This is because the SCF fundamentally asserts an independent right under Section 325(d) to carry out the services or, alternatively, that the services were transferred to it by the ANTHC. Final Offer at 7. But the SCF also indicated in August 2024 that the ANTHC previously spent about $6 million dollars per year providing the identified MCH services under the MOA, and that apparently the SCF is spending approximately $10 million dollars per year. _See_ Ex. 60.1 at 4.

The foregoing only brings into sharper focus the strategic position that the SCF elected: first, it expressly avoids claiming additional Secretarial amount funds for purposes of attempting to prevail via the final offer (even withdrawing its proposal relative to Speech and Language Pathology), yet it cites significant expenses for both the ANTHC and the SCF. The SCF artificially seeks to narrow the grounds for rejection by first seeking to impose a statutory interpretation that will, undisputedly in the future, yield requests for reimbursement of contract support costs and potentially additional Secretarial amount funds as well. Once PSFAs are added to an ISDEAA agreement, in all likelihood, they will remain in future years. _See, e.g._, 25 U.S.C. § 5385(e).

The SCF's intent is particularly apparent because on June 6, 2024, the United States Supreme Court decided _Becerra v. San Carlos Apache Tribe and Becerra v. Northern Arapaho Tribe_, 602

Page 39 – Ms. April Kyle

U.S. 222 (2024), holding that the IHS must pay eligible CSC incurred by Tribes and Tribal Organizations that expend program income, or third-party reimbursements, under their ISDEAA contracts and compacts. In other words, to the extent that the SCF validly operates services under its funding agreement and expends program income funds on valid services, it could theoretically pursue CSC related to eligible program income expenditures for those services.

The SCF avoiding seeking reimbursement of costs now does not limit the Agency's ability to determine that the SCF is not authorized to provide the services as a matter of independent right under Section 325(d), or similarly, that the ANTHC has not authorized the SCF to provide those additional health care services via transfer. The final offer itself must be rejected under 25 U.S.C. § 5387(c)(l)(A)(i) as in excess of the applicable funding levels to which the SCF is entitled.

### b.      The SCF Impermissibly Seeks to Carry Out an Inherent Federal Function Under 25 U.S.C. § 5387(c)(1)(A)(ii)

25 U.S.C. § 5381 defines the term "inherent Federal Functions" to mean "those Federal functions which cannot legally be delegated to Indian Tribes." Through its interpretation of Section 325 and based on its desire to unilaterally amend the services of another Co-signer, the ANTHC, under the Alaska Tribal Health Compact, the SCF seeks to stand in the shoes of the IHS through the final offer process. This is prohibited under 25 U.S.C. § 5387(c)(1)(A)(ii), both as to activities and services and as to facility space.

Specifically, for example, the SCF seeks to compel the conclusion that, as a matter of independent right conferred by Congress, it is exclusively authorized to perform "perinatology" services in the ANMC hospital when such services already are under the Compact and appear expressly in the ANTHC's funding agreement under Section 325(a) and (c). Ex. 94 § 3.1.7.1.10. In effect, the SCF seeks to determine what terms may be agreeable as to the ANTHC under Section 325 and the ISDEAA regarding the ANMC, and to the extent there is funding now or in the future, presumably the SCF would compel that it be awarded to the SCF by operation of law. *See* 25 U.S.C. § 5388(d). Similarly, the SCF could duplicate services as it wishes under the auspices of those occurring "through" the ANPCC (or other satellite clinics) but at the ANMC, thereby further expanding its funding sources essentially without limit. But the Agency has rejected attempts by other Tribal Organizations in Alaska to impact one another or their respective Tribes through the Final Offer process, 25 U.S.C. § 5386(g), and it reaches the same conclusion here. 25 U.S.C. § 5387(c)(1)(A)(ii).

Finally, the SCF encroaches into the Agency's inherently Federal functions by seeking to compel the Agency to award services when ANTHC has expressly represented it does not want, did not authorize, and did not intend such a transfer of services under either Section 325 or the ISDEAA. The Agency rejects the SCF substituting its judgment for the Agency's and accordingly rejects the proposal under 25 U.S.C. § 5387(c)(1)(A)(ii).

Page 40 – Ms. April Kyle

## II.     The IHS Rejects the Southcentral Foundation's Proposal to add "Occupancy and Use" Terms through an FY 2025 Amendment

The Agency respectfully rejects the Final Offer in accordance with 25 U.S.C. § 5387(c)(1)(A)(i)-(ii), including to the extent it is intended to pave the way for future Section 105(*l*) funding and otherwise seeks to claim inherently Federal functions regarding use of a federally owned facility, the ANMC hospital.  As discussed below, the "Occupancy and Use" Final Offer proposal violates the limits imposed by Congress to regarding "primary care" services in the ANMC hospital, and otherwise seeks authority to which CIRI/SCF is not authorized. 25 U.S.C. §§ 5381(b) & 5392.

Relevantly, 25 U.S.C. § 5392(c) provides for the use of existing hospitals under Title V. Specifically, section 5392(a) establishes that in connection with any compact or funding agreement executed pursuant to Title V, upon request of an Indian Tribe, the Secretary: "(1) *shall permit an Indian tribe to use existing* school buildings, *hospitals*, and other facilities and all equipment therein or appertaining thereto and other personal property owned by the Government within the Secretary's jurisdiction *under such terms and conditions as may be agreed upon by the Secretary and the Indian tribe for their use and maintenance*[.]"  In contrast, the SCF's Final Offer proposes the following terms utilizing broader language such as "entitled to":

> d) **Tribal Facilities, Locations and Personal Property**. Unless otherwise specified, SCF operates the programs or portions of programs described in this FA out of more than one facility or location and uses personal property owned by the ANTHC, by SCF, and by IHS in some of these facilities and locations. <u>These include, ANMC, which SCF is entitled to occupy and use, in conjunction with ANTHC, so long as SCF carries out the PSFAs described in this Funding Agreement.</u>

Final Offer FY 2025 Am.

In contrast to, and prior to the SCF pausing negotiations, the Agency countered in September 2024, language that focuses on permissive use consistent with section 5392(c) and relevant statutory limitations:

> Section 3(d) – Tribal Facilities, Location, and Personal Property.:
>
> "Unless otherwise specified, SCF <u>uses one or more facilities or locations to</u> operate~~s~~ the programs or portions of programs described in this FA ~~out of more than one facility or location~~ and uses personal property owned by the ANTHC, by SCF, and by IHS in some of these facilities and locations.
>
> <u>SCF is permitted to use the Alaska Native Medical Center hospital, in conjunction with ANTHC, for so long as SCF carries out relevant PSFAs described in this funding agreement relative to the ANMC hospital and in accordance with applicable authorities, including Section 325(d) of P.L. 105-83."</u>

Ex. 82. There are several key differences between the Final Offer and the Agency's counterproposal that demonstrate why the SCF's language must be rejected, consistent with Section 325(d) and the ISDEAA.

Page 41 – Ms. April Kyle

Initially, the SCF overreaches in describing the facility.  Specifically, it became clear through extensive discussions in August 2024, that the SCF only seeks to address the ANMC hospital, which is federally owned, and not the broader ANMC campus that includes dozens of additional buildings of varying ownership.  In contemporary usage, "ANMC" may be used to mean the hospital or the campus.  And in this sense, use of the phrase "ANMC" is ambiguous and could be interpreted to include non-Federal spaces, including buildings or facilities owned by the ANTHC.  The SCF's language fails to take this into account.

The SCF also fails to acknowledge any substantive or conditional limit to its use of the ANMC hospital.  The Agency's counterproposal to "Occupancy and Use" clarified that the scope of the SCF's services, which are much broader than services provided at the ANMC hospital, depend on multiple authorizing Tribes, are unrelated to use of the ANMC hospital.  For example, this would include services authorized by the Iliamna Villages, or on St. Paul Island, and any continuation of such services does not permit ongoing use of the hospital.  The contemporary organization of the SCF is not the same as during the 1990s, and the SCF overlooks that it has received Tribal Resolutions from numerous Tribes outside Anchorage, Alaska.  This also highlights the problematic overbreadth of the term "entitled."

An additional limit that must be accounted for is the potential that the CIRI could utilize a different Tribal Organization for "primary care" services at the ANMC, which is expressly contemplated under the third-sentence of Section 325(d), even though other services under the funding agreement could theoretically continue.  This too would also end any permissive use, as Section 325(d) provides: "In addition, Cook Inlet Region, Inc., through Southcentral Foundation, *or any lawfully designated health care entity of Cook Inlet Region, Inc.*, shall contract or enter into a funding agreement under Public Law 93–638 (25 U.S.C. 450 et seq.), as amended, *for all primary care services provided by the Alaska Native Medical Center* . . . ." CIRI has historically elected to change tribal organizations and could theoretically do so in the future. *Cf. Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471, 1473 (9th Cir. 1987).  This is also a limit under the ISDEAA.

The SCF also fails to acknowledge limits to its use of the ANMC hospital under Section 325(d), highlighted extensively above, but that appears now intertwined with permissive use of the ANMC hospital beyond "primary care" services.  In this way, the SCF's Final Offer proposal regarding "Occupancy and Use" serves as another arena for control over the larger ANMC hospital and its services discussed above.  Again, this is because the SCF takes the position in its Final Offer it is authorized to provide "all PSFAs provided at or *through*" the ANPCC (or other satellite clinics), including "ANPCC PSFAs actually performed at ANMC."  SCF Final Offer at 5.  In other words, the SCF signals no limit to its services or use of the ANMC hospital so long as both are "through" the ANPCC, which also self-qualify as "necessary related services" performed at the ANMC, and which would also auto-qualify for additional use of the facility. But this directly violates Section 325's text, context, and structure, and the Agency must reject the present "Occupancy and Use" language like the MCH Services discussed above for failing to address the "primary care" boundaries explicitly drawn by Congress.

Page 42 – Ms. April Kyle

Finally, the SCF invokes the language that it is "entitled to occupy and use," which contrasts the Agency's counterproposal that states "SCF is permitted to use. . . ." However, Title V of the ISDEAA at 25 U.S.C. § 5392(c) specifically provides for permissive use:

> In connection with any compact or funding agreement . . . upon the request of an Indian tribe, the Secretary—**(1)** _shall permit_ an Indian tribe _to use_ existing school buildings, _hospitals_, and other facilities . . . _under such terms and conditions as may be agreed upon by the Secretary and the Indian tribe for their use and maintenance_;

Ultimately, the relevant part of the Agency's counterproposal presented in September 2024 closely tracks Title V, whereas the SCF's proposal does not. Instead, it seeks an "entitlement" to which the IHS cannot agree and seeks to convert the Agency's discretion regarding the terms and conditions as may be agreed upon into mandatory conditions that may be imposed regarding the use of Federal space. Through submission of the Final Offer on "Occupancy and Use," the SCF sets the stage for potential future funding.

The Agency accordingly rejects the SCF Final Offer in accordance with 25 U.S.C. § 5387(c)(1)(A)(i). The Agency also rejects the Final Offer for "Occupancy and Use," because it seeks limitless use, despite the fact that control of a Federal facility is an inherent Federal function and, another tenant, the ANTHC, uses the facility for the administration and delivery of health care services. 25 U.S.C. § 5387(c)(1)(A)(ii).

### Conclusion

In accordance with 25 U.S.C. § 5387(c) and consistent with the foregoing, the IHS rejects the SCF's Final Offer seeking to add subspecialty services in the ANMC hospital, specifically Maternal Fetal Medicine, Gynecological Oncology, and various pediatric subspecialty services. The SCF's proposal violates the text, context, and structure of Section 325 of Public Law 105-83, as the services at issue are not "primary care" services. Moreover, the ANTHC has not agreed that the SCF can carry out the additional services. The Agency likewise rejects the SCF's Final Offer regarding "Occupancy and Use" of the ANMC hospital.

In accordance with 25 U.S.C. § 5387(c)(1)(B) and 42 C.F.R. § 137.145, please contact Ms. Evangelyn Castagna by email at evangelyn.castagna@ihs.gov to request technical assistance to determine whether the parties may develop any modifications to overcome the objections.

Regarding MCH services, technical assistance would specifically include requesting: (1) an authorizing resolution from the ANTHC Board of Directors to provide specifically identified additional subspecialty health care services by the ANMC; (2) clarifying what, if any, services would continue to be provided by the ANTHC, if the ANTHC Board of Directors sought to limit any services or retain any such services (in part).

Regarding "Occupancy and Use," technical assistance would involve: (1) adhering to 25 U.S.C. § 5392(c); or (2) adopting limits to use consistent with applicable authorities including the ISDEAA, as well as Section 325(d).

Page 43 – Ms. April Kyle

## <u>Appeal Rights</u>

Within 30 days of receiving this decision, you may request an informal conference under 42 C.F.R. § 137.421 or appeal this decision under 42 C.F.R. § 137.425 to the Interior Board of Indian Appeals (IBIA).  Should you decide to appeal this decision, you may request a hearing on the record.  An appeal to the IBIA under 42 C.F.R. § 137.425 must be filed with the IBIA by certified mail or hand delivery at the following address:

Board of Indian Appeals
U.S. Department of the Interior
801 North Quincy Street
Arlington, VA  22203

You shall serve copies of your Notice of Appeal on the Secretary and on the official whose decision is being appealed.  You shall certify to the IBIA that you have served these copies. In lieu of filing such an appeal, you may, at your option, initiate an action in Federal District Court and proceed directly to such court in accordance with 25 U.S.C. § 5331(a).

Sincerely,


P. Benjamin Smith
Deputy Director

cc:  Charles W. Galbraith, Jenner Block